Michael K. Kennedy (004224)
Mark C. Dangerfield (010832)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
P: (602) 530-8000
F: (602) 530-8500
E-mails: mkk@gknet.com
            mark.dangerfield@gknet.com
*Attorneys for Plaintiff Gallagher & Kennedy, P.A.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GALLAGHER & KENNEDY, P.A., | Case No. CV-16-4447-PHX-DAE |
| Plaintiff, | |
| vs. | **PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT RE: CERCLA LIABILITY AS TO DEFENDANTS CITY OF PHOENIX, MARICOPA COUNTY, AND PRUDENTIAL OVERALL SUPPLY** |
| CITY OF PHOENIX, et al., | |
| Defendants | |

As directed by Fed. R. Civ. P. 56 and Local Rule 56.1, Plaintiff Gallagher & Kennedy, P.A. ("G&K") submits this Statement of Facts in support of its motion for partial summary judgment regarding CERCLA liability as to Defendants City of Phoenix, Maricopa County, and Prudential Overall Supply.

**A.    RID's wells have been contaminated by hazardous VOCs.**

1.    Roosevelt Irrigation District ("RID") owns and operates a series of water supply wells located in a well field in southwestern Phoenix. [Ex. 9 (Revised Draft Feasibility Study at ES-1 and -2)]

2.    RID's water supply wells provide water to public and private entities and individuals in the western part of Maricopa County, Arizona for multiple beneficial uses.

[Ex. 1 at Appendix K, RID Questionnaire (August 2012 Remedial Investigation Report, West Van Buren Area QWARF Registry Site, hereafter "2012 WVBA RI Report")]

3.      In 1987, the Arizona Department of Environmental Quality ("ADEQ") designated a large area around the RID wells as a state superfund site called the West Van Buren Area ("WBVA") Water Quality Assurance Revolving Fund ("WQARF") Registry Site. [Ex. 9 (Revised Draft Feasibility Study at 1-2)]

4.      "WQARF" Registry Sites are areas where significant quantities of groundwater or soil contamination exist. *Id.*

5.      The WVBA WQARF Site extends from approximately McDowell Road on the north to lower Buckeye Road on the south, and from 7th Avenue on the east to 75th Avenue on the west. [Ex. 1 at p.1-1 (2012 WVBA RI Report)]

6.      Thirty-three RID's wells are located within or near the WVBA Site. Ex. 9 (Revised Draft Feasibility Study at ES-2)]

7.      By 2009 – after more than 20 years spent investigating the WVBA Site – ADEQ had determined that groundwater in the WVBA had become contaminated and had thus "impacted multiple RID water supply wells…" [Ex. 4 at 1(October 8, 2009 Agreement to Conduct Work)] ADEQ found that groundwater in the WVBA had become contaminated by man-made volatile organic compounds ("VOCs") that included TCE, PCE, TCA, and 1,1 DCE, among others. [Ex. 1 1-1 (2012 WVBA RI Report)]

8.      Each of these VOCs is a "hazardous substance" under CERCLA. 42 U.S.C. § 9601(14); 40 C.F.R. §§ 261.31, 302.4.

9.      In addition, ADEQ has found that 24 RID wells have detectable concentrations of one or more hazardous VOCs, including PCE, TCE and 1,1, DCE. [Ex. 9 (Revised Draft Feasibility Study at ES-2); Ex. 1 (2012 WVBA RI Report, Table 2.4); *see also* Ex. 9 at p. 8)]

10.     RID, however, was not the source of the contaminants. Rather, VOCs released from numerous businesses, both within and without the WBVA Site, contributed to a combined plume – traveling generally from east to west – that contaminated the

1    WBVA groundwater and RIDs' water supply wells, resulting also in the further release of

2    these hazardous VOCs into the air of the local community. [Ex. 2 at 1-1; Ex. 9 at 14-15]

3         11.    As stated in ADEQ's 2012 WVBA RI Report, the "WVBA is the areal

4    projection of the western portion of a large commingled plume of contaminated

5    groundwater," which has been contributed to by "industrial facilities and contaminated

6    groundwater from the east, as regional groundwater flow is generally westward." [Ex. 1

7    at 1-1]

8
9       **B.**    **Some of the same hazardous VOCs contaminating RID's wells were released and threaten to be released at each of the three Defendants' sites.**

10
11            1.    The City of Phoenix owns part of the 34th Street Facility, from which some of the same hazardous VOCs have been released as exist in the RID water supply wells.

12
13         12.    The 34th Street Facility, street address 111 S. 34th Street in Phoenix, includes

14    approximately 118 acres and consists of about 130 buildings, divided into five areas. [Ex. 2

15    (Final Focused Remedial Investigation Report Honeywell 34th Street Facility ("34th Street

16    Final FRI Report"), Vol. 1 at 1-5, and Figure 1-2)]

17         13.    The City of Phoenix owns Areas 1 and 4 of the 34th Street Facility, which are

18    located on the south side of Air Lane, immediately north of Sky Harbor Airport, and

19    comprise the majority of the 118 acres. *Id.*

20         14.    The City of Phoenix leases Areas 1 and 4 to an industrial user. *Id.*

21         15.    The 34th Street Facility was constructed in 1951 and continues to operate

22    today. [Ex. 2 (34th Street Final FRI Report at vi)]

23         16.    The City of Phoenix admits that it owns and leases property to an industrial

24    user at this location. [Ex. 18 (City of Phoenix's Answer to Second Amended Complaint in

25    *Roosevelt Irrigation District v. Salt River Project et al.,* CV2010-00290 ("RID Action"), at

26    p. 29, ¶ 176; p. 32, ¶196)]

27         17.    Among other uses, jet engine design, assembly, testing and repair have been

28    conducted at the 34th Street Facility. [Ex. 2 (34th Street Final FRI Report at vi)]

18.    Operations at the 34th Street Facility have used large quantities of chlorinated VOCs for degreasing and cleaning engine parts, among other uses. *Id.* at vi; xiii-xiv; 1-6; 1-12)]

19.    In ADEQ's "Findings of Fact" set forth in a 1999 Consent Order relating to the 34th Street Facility, ADEQ stated that elevated levels of various hazardous VOCs, including TCE, had "been detected in some groundwater samples collected from groundwater monitoring wells on and downgradient from the Facility." [Ex. 11 (1999 Consent Order at p.3, ¶¶9-10)]

20.    In ADEQ's "Conclusions of Law and Determinations" set forth in the 1999 Consent Order, ADEQ determined that there had "been a release or threat of a release of hazardous substances" from the Facility, which "may present an imminent and substantial danger of the public health or welfare or the environment." [Ex. 11 (1999 Consent Order at pp.3 ¶12)]

21.    In 1993, the EPA named the City of Phoenix a PRP, since it owned part of the 34th Street facility. [Ex. 15 (2011 ADEQ Sitewide Five-Year Review Report, Appendix A at A-7)]

22.    The 34th Street Final FRI Report found that solvents with TCE and TCA were used in all areas of the Facility, but the majority of operations using such hazardous VOCs were conducted on the City of Phoenix-owned parcels comprising Areas 1 and 4. [Ex. 2 (34th Street Final FRI Report at viii; 1-6; 1-12; 1-86; 1-88]

23.    The 34th Street Final FRI Report estimates that, since 1970, in one building of Area 4, 3,300,000 pounds of TCE and TCA have been used for such purposes. *Id.* at 1-88.

24.    The 34th Street Final FRI Report documents releases of hazardous VOCs to the environment, including TCE and PCE, for much of the operational history of the Facility. *Id.* at vi; xiv; 1-6; 1-12.

25.    The City of Phoenix "does not dispute that there was a release of TCE and 1,1,1-TCA" at the [34th Street] Facility, or that, according to the 34th Street Final FRI Report, "TCE, PCE, TCA, 1,2,-DCE and cis-1,2-DCE were detected in soil samples…." [Ex. 19

1   (City of Phoenix's Reponses to Plaintiff's Second Set of Interrogatories in RID Action, at p.
2   10)]

3          26.     The 34th Street Final FRI Report also states that since 1958, the "Oil Yard" at
4   Area 1 was the main area for TCE and TCA handling, dispensing, and storage. [Ex.2 (34th
5   Street Final FRI Report at 1-86)]

6          27.     In Area 4 of the 34th Street Facility, workers disposed of solvent wastes on the
7   ground, and there are also records of solvent spills in some of the buildings. *Id.* at 1-88; 1-
8   89.

9          28.     In total, Areas 1 and 4 of the 34th Street Facility have experienced documented
10  releases of TCE and TCA totaling more than 3,000 pounds, and estimated releases totaling
11  6,000 to 10,000 pounds.  [Ex. 2 (34th Street Final FRI Report at 1-86; 1-88)]

12         29.     The 34th Street Facility is located within the federal Motorola 52nd Street
13  Superfund Site (the "M52 Site"). *Id.* at v. Because of its size, the M52 Site has been divided
14  into three "Operable Units," OU1, OU2, and OU3, and the 34th Street Facility is located in
15  OU2. *Id.*

16         30.     The EPA put the M52 Site on its National Priorities "Superfund" List in
17  October 1989, after confirming substantial releases of TCE from the Motorola facility.  [Ex.
18  11 (1999 Consent Order, p. 2, ¶6)]

19         31.     ADEQ has concluded that groundwater contaminated with VOCs from the
20  M52 Site commingle and flow westward from the Motorola site in OU1 into OU3, and then
21  continues to flow into the WVBA. [Ex. 17 (April 24, 2018 ADEQ letter to EPA)]

22         32.     This is consistent with the results of the 34th Street Final FRI Report, which
23  concluded:

24             Over the years of Facility operations, releases of chemicals of concern
25             to the subsurface have caused both soil and groundwater
              contamination which have become commingled with the larger
26             regional plume.

27  [Ex. 2 (34th Street Final FRI Report at vi)]

28

33.     The 34th Street Final FRI Report also concluded that by the date of the report (2005), TCE released from the 34th Street Facility in 1951, its first year of use, "may have traveled as far as 8 miles downgradient" of the facility, which would have brought the TCE far into the WVBA and into the midst of the RID wellfield.  [Ex. 2 (34th Street Final FRI Report at xx]

34.     In a 2007 Complaint against, among others, the industrial user to whom the City of Phoenix leases Areas 1 and 4 of the 34th Street Facility, ADEQ asserted that hazardous substances within the meaning of CERCLA Section 101(14), including trichloroethene (TCE), had been disposed of at the 34th Street Facility, and released into soils and groundwater. [Ex. 13 (10/16/07 Complaint, ¶¶11, 12, 14, 17)]

35.     In light of that, on October 17, 2007, the industrial user of the 34th Street Facility entered into a Consent Decree with the State of Arizona and ADEQ to take certain remedial actions. [Ex. 14 (10/17/07 Consent Decree)]

2.     <u>Maricopa County owns the Maricopa County Materials Management Facility, from which some of the same hazardous VOCs have been released as exist in the RID water supply wells</u>.

36.     Maricopa County owns an approximate four-acre site at 320 West Lincoln Street, Phoenix, which it admits it acquired "in a series of parcel transactions in 1973-1979." [Ex. 23 (Maricopa County's Objections and Responses to Plaintiff's First Set of Requests for Admission, RID Action, at pp. 8-9; *see also* Ex. 22 (Maricopa County's Answer to Second Amended Complaint, RID Action, at p. 16, ¶¶131-132)]

37.     The property at 320 West Lincoln is known as the Maricopa County Materials Management facility (the "MCMM Facility"). [Ex. 1 (2012 WVBA Report at 1-6)]

38.     The MCMM Facility is within the WVBA. *Id.* at 1-7; 1-22; Table J-3 at p. 7.

39.     Part of the MCMM Facility property had been formerly leased to Southwest Solvents, a cleaning solvent recycling company.  *Id.* at 1-6

40.     Numerous cleaning solvents were stored and recycled at the MCMM Facility while Southwest Solvents operated from about 1964 until its lease was terminated in 1974. *Id.* at 1-6; 1-7.

41.     After Maricopa County acquired the site, it built a warehouse to house a printing operation that used cleaning solutions containing PCE. *Id.* at 1-7.

42.     Maricopa County admits that "hazardous substances at unspecified times were located at or on" portions of the property, and that the site could be its own "facility" under CERCLA. [Ex. 23 (Maricopa County's Objections and Responses to Plaintiff's First Set of Requests for Admission, RID Action, at p. 22)]

43.     Site investigations at the MCMM facility have documented the presence of one or more VOC contaminants in the soil gas, soil, and groundwater beneath the property, including PCE, TCE, 1,1-DCE, cis-1,2-DCE and 1,1-DCA, all of which are hazardous substances under 42 U.S.C. § 9601(14). [Ex. 1 (2012 WVBA RI Report at 1-22; 4-2)]

44.     In 1997, Maricopa County initiated some remediation efforts on the soil contamination using a soil vapor extraction system. *Id.* at 2-33.

45.     In 2001, Maricopa County negotiated a settlement with ADEQ, agreeing to pay $450,000 for ADEQ's response and oversight costs for the MCMM Site. *Id.* at 1-13.

46.     The 2012 WVBA RI Report states that MCMM is one of the nine most significant contaminant sources identified in the WVBA WQARF Site. *Id.* at 1-22.

47.     The 2012 WVBA RI Report further states that "releases of PCE which occurred at the MCMM facility affected groundwater," and "groundwater and soil data collected from the MCMM facility indicate that a TCE release to the vadose zone and UAUI [upper groundwater aquifer] occurred at the MCMM facility." *Id.* at 4-5.

48.     In addition, another ADEQ Report concludes that the MCMM warehouse at 320 West Lincoln is one of six facilities where "[r]eleases are documented to have occurred," and that "ADEQ believes these facilities are contributing to area-wide groundwater contamination." [Ex. 12 (January 28, 1998 WVB Site Registry Report)]

> 3.     Prudential owns an industrial laundry from which some of the same hazardous VOCs have been released as exist in the RID wells.

49.     As Prudential admits, it owns property at 5102 West Roosevelt Street in Phoenix (the "Prudential Facility") (Ex. 20 (Prudential's Answer to Plaintiff's Third Amended Complaint, RID Action, at p. 22, ¶ 138)]

50.     The Prudential property at 5102 West Roosevelt Street is within the boundaries of the WVBA Site [Ex. 1 (2012 WVBA RI Report at 1-22 to 1-23; Table J-3 at p. 8)]

51.     Prudential there operates an industrial laundry, which formerly included a dry cleaning operation. *Id.* at 1-10 and 1-11.

52.     Dry cleaning operations began in 1982 and ended in 1991. During that time, approximately 4,800 gallons of PCE per year was used as dry cleaning solvent at the facility. *Id.*

53.     In addition, "Safety-Clean," a solvent containing PCE, was used in a small parts washer located in the automotive garage. *Id.*

54.     ADEQ has determined that there was a release of contaminants at the Prudential Facility. [Ex. 1 (2012 WVBA RI Report at 2-29 to 2-30)]

55.     ADEQ has also determined that both PCE and TCE have been detected in soils beneath the facility. *Id.* at 1-23)] ADEQ has also concluded that "releases of PCE occurring at the [Prudential] facility contaminated groundwater beneath the facility and migrated downgradient of the facility." *Id.* at 4-16.

56.     In addition, a July 2008 Gore-Survey Report prepared on behalf of Prudential, and submitted to ADEQ, found PCE at all 68 locations sampled at the site, and found TCE at 57 of the 68 sample locations. [Ex. 3 (Gore-Survey Report at 10)] The report concluded that "elevated concentrations of PCE are present beneath a majority of the Site," and found that data "consistent with the historical use and handling of PCE." *Id.* at 11.

57.     As Prudential admits, "VOCs have been detected in soils and groundwater" at that site. [Ex. 20 (Prudential's Answer to Plaintiff's Third Amended Complaint, RID Action, at p. 23, ¶¶140-42)]

58.     The 2012 WVBA RI Report identifies the Prudential Facility as one of the nine most significant contaminant sources in the WVBA WQARF Site. [Ex. 1 (2012 WVBA Report at pp. 1-22 to 1-23)]

C.    **A plausible migration pathway shows how the contaminants traveled from the Defendants' facilities to the RID well field.**

59.    ADEQ has found that contaminants released into the soil of the M52 site or WVBA Site will likely drift downward in the permeable soil until they reach and dissolve in the groundwater, at which point they will move with the groundwater in a generally westward direction toward the WVBA and the RID wellfield, in response to the pumping of RID's groundwater wells. [Ex. 1 (2012 WVBA RI Report at 5-1; 3-5; 5-6; 6-1 to 6-4]

60.    ADEQ's 2012 WVBA RI Report states that once VOCs are released into the soil, unsaturated flow is primarily vertically downward, "until either a change in lithology or the groundwater table are encountered." *Id.* at 5-1]

61.    And since the "vadose zone soils" – the topmost layer of the earth – are "generally permeable, unsaturated flow in the WVBA typically continues to the groundwater table." *Id.*

62.    The physical and chemical properties of the VOCs make it easy for them, once released, to penetrate through the porous soil to the groundwater. *Id.*

63.    Once the hazardous VOCs reach the groundwater, they dissolve into the uppermost aquifer, where groundwater movement within the region is predominantly controlled by RID well pumping. *Id.* at 5-2.

64.    As the RID water wells pump groundwater for various uses, the pumping action creates a groundwater trough or depression that inexorably draws the contaminated groundwater into the WVBA and the RID wellfield.  [Ex. 1 at 3-6; 3-8; 5-4; Ex. 16 (2014 Feasibility Study Report, West Van Buren Area WQARF Site, Appendix F at 2, and Appendix A, Site Conceptual Model, at A-9)]

65.    This migration pathway was acknowledged by the City of Phoenix and Prudential in their Working Group Feasibility Study Report, noting that "[RID] pumping since the 1950s has resulted in an extensive, regional groundwater depression that controls groundwater gradients over much of the central and northern portions of the [West Salt River Valley]," including the M52 and WVBA Sites. [Ex. 16, Appendix A, at A-9)]

66.     In an April 24, 2018 letter from ADEQ to the EPA, ADEQ asked the EPA to expand the M52 Superfund Site to include parts of the WVBA. [Ex. 17] In that letter, ADEQ stated that its investigations had shown that contaminants from the M52 Site had migrated to the WVBA. *Id.* According to that letter, "an evaluation of the M52 and West Van Buren Site data shows that [a] TCE plume extends unbroken from the Motorola [52nd Street] facility to approximately 69th Avenue." *Id.*

   **D.     In assisting RID in responding to the polluted RID wells, G&K incurred necessary response costs in substantial compliance with the NCP.**

67.     In October 2008 RID engaged G&K to "secure the necessary professional services on behalf of RID to implement a remedial action if necessary." [Ex. 25, p. 2, ¶7 (9/11/18 Decl. David P. Kimball III ("D. Kimball Decl."))]

68.     The 2008 G&K Engagement Letter with RID authorized G&K to represent RID in all matters related to a Proposed Water Project, known as the "Project," which included exploring the prospects of remediating certain RID water and delivering such water to customers. *Id.* ¶ 8

69.     In 2009, ADEQ and RID entered into an Agreement to Conduct Work, based on ADEQ's finding "that releases or threatened releases of hazardous substances have …result[ed] in groundwater contamination that has impacted multiple RID water supply wells… within the [WVBA] Site.…which may present an imminent and substantial endangerment to the public health, welfare or the environment within the [WVBA] Site." [Ex. 4 (2009 Agreement to Conduct Work at 1)]

70.     G&K's status as an authorized agent of RID was evidenced in the October 8, 2009 Agreement to Conduct Work between RID and ADEQ, where G&K's Mr. David Kimball was recognized as a representative of RID and signed the agreement on RID's behalf. *Id.*

71.     G&K, on behalf of RID, performed the work required under the October 8, 2009 Agreement to Conduct Work between RID and ADEQ and activities associated with

1    remedial action efforts to address RID's wells and water supply in the WVBA WQARF

2    Site that have been contaminated by hazardous substances. [Ex. 25 (D. Kimball Decl. ¶ 11)]

3        72.    Under the RID-G&K Engagement Letters, RID authorized G&K to engage

4    consultants to perform any services necessary to investigate the contamination, design any

5    remediation and delivery system or other actions and measures in furtherance of the Project

6    to develop a remedial solution for the hazardous substances impacting RID's wells and

7    water supply.  [Ex. 25, ¶12]

8        73.    Pursuant to the RID-G&K Engagement Letters, G&K and the consultants

9    have specifically:

10        a.    investigated, monitored, assessed and evaluated the groundwater

11    contamination and its sources, including any potentially responsible parties. *Id.*

12        b.    prepared various work plans and reports and performed activities to

13    develop and implement an Early Response Action and Feasibility Study that would

14    address the impacts of the contaminated groundwater on the RID water supply

15    wells and the hazardous emissions to the local community through the pumping

16    and treatment of the groundwater contamination. *Id.*

17        c.    designed the various work plans and reports to comply with the

18    applicable mandatory remedial action criteria in Ariz. Rev. Stat. § 49-282.06, to

19    meet the applicable water quality standards and to be consistent with other

20    groundwater remedial actions in Arizona. *Id.*

21        d.    held numerous meetings with ADEQ and interested members of the

22    community consistent with the WQARF approval procedures and community

23    involvement activities to explain the various work plans, reports and remedial

24    actions and to respond to any public comments. *Id.*

25        e.    obtained ADEQ's approval of the Early Response Action, Modified

26    Early Response Action and Feasibility Study Report and have implemented and

27    continue to implement those approvals pursuant to the October 8, 2009 Agreement

28    to Conduct Work between RID and ADEQ and  the ADEQ-certified RID

11

1    Operation and Maintenance Work Plan. *Id.*

2    74.    The work plans G&K helped prepare were specifically designed to satisfy

3    Arizona statutory requirements for remediation plans, which require the plans to (1)

4    "[a]ssure the protection of public health and welfare and the environment"; (2) "[t]o the

5    extent practicable, provide for the control, management or cleanup of the hazardous

6    substances in order to allow the maximum beneficial use of the waters of the state"; (3) "[b]e

7    reasonable, necessary, cost-effective and technically feasible"; and (4) "address, at a

8    minimum, any well that at the time of selection of the remedial action…would now or in the

9    reasonably foreseeable future produce water that would not be fit for its current or reasonably

10   foreseeable end uses without treatment due to the release of hazardous substances." A.R.S.

11   § 49-282.06(A)-(B).

12   75.    In June 2010, ADEQ approved RID's Early Response Action ("ERA") work

13   plan, and later, in February 2013, approved a Modified ERA, as "in compliance with

14   applicable state statutes and rules." [Exs. 5-8]

15   76.    In April 2015, ADEQ also approved RID's Feasibility Study that selected a

16   proposed remedial action to address the contamination of RID's wells for "meet[ing] the

17   requirements of Arizona Revised Statutes 49-287.03 and Arizona Administrative Code R-

18   18-16-407." [Exs. 9-10]

19   77.    G&K's response costs include having spent more than $400,000 of its own

20   funds to pay consultants, engineers and contractors for CERCLA response work, in addition

21   to having incurred millions of dollars in unpaid technical and legal services relating to the

22   remediation. [Ex. 25 at ¶¶18; 20]

23   78.    Consistent with the RID-G&K Engagement Letters, funds obtained by and on

24   behalf of RID related to RID's remediation project ("Project Funds") are available for

25   paying ADEQ's remedial action oversight costs and compensating those who have

26   performed the remedial action work on behalf of RID consistent with RID's obligations

27   under the October 8, 2009 Agreement to Conduct Work between RID and ADEQ and the

28   ADEQ-certified RID Operation and Maintenance Work Plan. *Id.* at ¶14.

79.    G&K has spent nearly two million dollars from the Project Funds to pay ADEQ, consultants, engineers and contractors to investigate, monitor, assess, evaluate, approve, develop and implement work plans and reports and perform remedial action activities consistent with the WQARF approval procedures and community involvement activities. [Ex. 25 at ¶19]

80.    In addition, there are millions of dollars in unpaid technical and legal services incurred to investigate, monitor, assess, evaluate, develop and implement work plans and reports and perform remedial action activities consistent with the WQARF approval procedures and community involvement activities. *Id.* ¶20.

81.    ADEQ has determined that the response costs were "reasonable, necessary and cost-effective remedial action costs incurred in response to a release or threat of a release of a hazardous substance…that presents an immediate and substantial endangerment to the public health or the environment." [Ex. 24 (August 7, 2013 letter from ADEQ to Donovan Neese)]

82.    As the Court held in the *RID* action, the incurred costs for the remediation "did as a matter of law substantially comply with the applicable requirements set forth in the NCP." *RID* Dkt. 1394 (03/15/17 Order at 42).

RESPECTFULLY submitted this 12th day of September, 2018.

GALLAGHER & KENNEDY, P.A.

By */s/ Michael K. Kennedy*
    Michael K. Kennedy
    Mark C. Dangerfield
    2575 East Camelback Road, Suite 1100
    Phoenix, Arizona  85016
    *Attorneys for Plaintiff*
    *Gallagher & Kennedy, P.A.*

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on this 12th day of September, 2018, I electronically

3

transmitted a PDF version of this document to the Clerk of the Court, using the CM/ECF
System for filing and for transmittal of a Notice of Electronic Filing to the CM/ECF

4

registrants.

5

*/s/ Rona L. Miller*

6

7

8

9

6794075v1/99-0533

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14