**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **Gallagher & Kennedy PA,** | ) | |
| | ) | No.  **CV-16-4447-PHX-DAE** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | February 21, 2019 |
| **City of Phoenix, et al.,** | ) | 9:03 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DAVID A. EZRA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION HEARING**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CV-16-4447-PHX-DAE – February 21, 2019

1

2                              **A P P E A R A N C E S**

3

For the Plaintiff:
4        Gallagher & Kennedy
         By:  **Mark C. Dangerfield,** Esq.
5             **Michael K. Kennedy,** Esq.
         2575 East Camelback Road, Suite 1100
6        Phoenix, Arizona 85016

7   For Defendant Prudential Overall Supply:
         Lewis Roca Rothgerber Christie
8        By:  **Stanley B. Lutz,** Esq.
         201 East Washington Street, Suite 1200
9        Phoenix, Arizona 85004

10  For Defendant City of Phoenix:
         Perkins Coie
11       By:  **Christopher David Thomas,** Esq.
         P.O. Box 400
12       Phoenix, Arizona 85001

13  For Defendant County of Maricopa:
         Maricopa County Attorneys Office – Civil Services Division
14       By:  **Ann Thompson Uglietta,** Esq.
              **Maxine S. Mak,** Esq.
15       222 North Central Avenue, Suite 1100
         Phoenix, Arizona 85004

16

17

18

19

20

21

22

23

24

25

—— CV-16-4447-PHX-DAE – February 21, 2019 ——

1    (Proceedings begin at 9:03 a.m.)

2         THE CLERK:  Civil case 16-4447, Gallagher & Kennedy

3    versus the City of Phoenix and others.  This is the time set

4    for hearing on pending motions.

5         Please announce your presence for the record.         09:03:30

6         MR. DANGERFIELD:  Your Honor, Mark Dangerfield and

7    Mike Kennedy here for Gallagher & Kennedy.

8         MR. LUTZ:  Your Honor, Stan Lutz with Lewis Roca

9    Rothgerber Christy on behalf of Defendant Prudential Overall

10   Supply.                                                    09:03:48

11        MR. THOMAS:  Good morning, Chris Thomas from the

12   Perkins Coie law firm on behalf of the City of Phoenix.

13        MS. UGLIETTA:  Good morning, Your Honor, Ann Uglietta

14   and Maxine Mak on behalf of Maricopa County.

15        THE COURT:  You want to make your appearance?         09:03:57

16        MR. KENNEDY:  Mike Kennedy for Gallagher & Kennedy.  I

17   thought he had introduced me.

18        THE COURT:  I don't know, did he?

19        MR. DANGERFIELD:  I did.

20        THE COURT:  Oh, okay.  I thought you were just         09:04:08

21   mentioning the firm.

22        MR. DANGERFIELD:  I apologize.

23        THE COURT:  That's fine.

24        Anybody in the back --

25        MR. DANGERFIELD:  He wanted to be introduced twice     09:04:13

1    anyway.

2            THE COURT:  Does anybody in the back want to note

3    their appearance?

4            Are you in stealth mode now?

5            I've known most of these fellows for 30 years now on                    09:04:26

6    all the cases we've had together.

7            Please be seated.

8            Well, I'll tell you, I thought I was getting out of

9    some pretty nasty weather in San Antonio until I got to

10   Phoenix.  So it's following me around.  Not exactly what we               09:04:45

11   would call -- I guess you need the weather though, you need the

12   rain, but it's not exactly Chamber of Commerce weather.

13           All right.  This morning we have a series of different

14   motions.  I think we'll start with the motions to dismiss.  And

15   it will be based -- I don't need argument on the 56(d) motion.            09:05:20

16   After I hear the substance of the various other substantive

17   motions, then I will make a decision as to whether I think this

18   case is really ripe to -- these motions are ripe to move

19   forward or not.

20           But I want to hear the substance of the -- I want to              09:05:43

21   hear the substance of the arguments before I make that

22   determination.  I didn't just want to make it on the papers.

23           So, we have plaintiff's motion for summary judgment,

24   we have the partial motion for summary judgment, and then we

25   have the motions to dismiss.                                              09:06:06

——— CV-16-4447-PHX-DAE – February 21, 2019 ———

1          So let me hear the motions to dismiss first, then

2     we'll get to the summary judgment motions.  All right?

3          Do you have some other way you'd like to do it?

4          MR. LUTZ:  Your Honor --

5          THE COURT:  People are staring at me like deer in the      09:06:18

6     headlights here.  I know that you're experienced enough so that

7     you're not shy.

8          MR. LUTZ:  Your Honor, I'll just clarify, when you say

9     that we'll get to the summary judgment motions, you're

10    referring to the 56(d) motion?                                 09:06:30

11         THE COURT:  Yes, that's right.

12         MR. LUTZ:  Okay.  Good morning, Your Honor.  Stan Lutz

13    with Lewis Roca Rothgerber Christie on behalf of Defendant

14    Prudential Overall Supply.  And for my various sins I've been

15    elected to take the lead, I guess today, on the motion to      09:06:51

16    dismiss.

17         I'm happy to focus wherever the Court would like me to

18    focus.  If you --

19         THE COURT:  Well, you can assume that I've read the

20    papers, as counsel.                                            09:07:01

21         I don't know if you've been -- have you been before

22    me?

23         MR. LUTZ:  I have been before you in the underlying

24    RID litigation, Your Honor.

25         THE COURT:  Well, I've got some from Pinal Creek here.    09:07:08

1       MR. LUTZ:  Yeah.  And I believe I may have appeared --

2   or at least been involved peripherally in Pinal Creek.  But

3   it's been some time.

4       Assuming that the Court has read the papers, I'd just

5   like to focus on a few points that I think are important with          09:07:22

6   respect to the motion to dismiss.  And I believe that brevity

7   is always the better strategy here.

8       So if you'd like, I'd like to talk essentially about,

9   one, background and context that I think is important in

10  considering the jurisdictional ripeness challenge, as well as          09:07:40

11  the legal sufficiency of the complaint, and then talk about how

12  that plays into those two issues.

13      So just by way of background and context, I think that

14  it's very important to recognize the very unique and

15  extraordinary circumstances that are presented here.                   09:07:55

16      Here we have a professional legal association,

17  Gallagher & Kennedy, that is operating under a contingency fee

18  agreement with a client, Roosevelt Irrigation District, RID.

19      Gallagher & Kennedy is now seeking, in essence, to

20  recover for portions of its accrued time that it spent                 09:08:16

21  representing RID, and for reimbursable expenses that it spent

22  in that representation of RID.  It's not seeking to recoup

23  those from RID, but it's seeking to recoup those from the

24  parties that RID had sued in a prior suit that has been

25  settled.  RID's claims have been dismissed with prejudice.             09:08:33

1  Nonetheless, Gallagher & Kennedy is now seeking those fees

2  against former defendants in that settled suit.

3          Gallagher & Kennedy is not a landowner whose property

4  has been injured in any way.  It is not a well owner whose

5  wells have been impacted.  It's not a water service provider          09:08:51

6  whose service area is being impacted.  It has no statutory or

7  other legal obligation to undertake any action out here in the

8  West Van Buren area.

9          In fact, its contingency fee agreement, we presume, is

10 still in place.  It and its client are still continuing to          09:09:12

11 operate under the -- or still attempting to put into place the

12 water project called for under that engagement agreement -- or

13 that engagement letter.  And that project, if successful, will

14 ultimately pay whatever expenses may have been incurred by RID

15 or by Gallagher & Kennedy and, in fact, present them with a          09:09:31

16 substantial windfall.

17         In any other context, if we were looking at a red

18 car/blue car case, typical tort claim, a contingency fee

19 attorney that sued the opposing -- its client's opposing party

20 to recover its fees, I think would be summarily rejected.  And          09:09:48

21 I think that the same should be held true here.

22         So with that context in mind, I'd like to talk briefly

23 about the jurisdictional ripeness issue, if you would.

24         And I think it's important to first point out when

25 we're talking about ripeness, as Gallagher & Kennedy has          09:10:03

1    pointed out, we need to determine what standard we're operating

2    under.  And as the papers point out, we believe it's clearly

3    12(b)(1).

4         We're not challenging, with this jurisdictional --

5    with this ripeness challenge, we are not challenging Gallagher     09:10:15

6    & Kennedy's failure to state a claim or state an element of a

7    CERCLA claim.  That's not what is happening.  Rather, we're

8    challenging -- assuming for the sake of argument that they've

9    properly stated that CERCLA -- all of the elements of the

10   CERCLA claim in their complaint, we're challenging whether or    09:10:38

11   not at this point in time they've suffered an injury in fact

12   that should allow this case to proceed forward, that renders

13   this case fit for judicial review.

14        Under the inquiry, and as the papers point out, it's

15   essentially necessary to look at two concepts.                   09:10:56

16        One, constitutionally.  Has the plaintiff suffered an

17   injury in fact?  Have they suffered some direct and immediate

18   injury at this point in time that allows this case to proceed

19   under Article III's case and controversy requirement.

20        And secondly there's a prudential analysis.  Is the         09:11:13

21   case fit for judicial review?  In other words, are the legal

22   theories developed, are the facts sufficiently developed and

23   not dependent upon noncontingent items?

24        And if that's the case, and there's going to be a

25   problem with that determination, the second question to be       09:11:27

1    asked under that prudential review is essentially whether or

2    not there would be any hardship suffered by the plaintiff by

3    denying review at this point in time.

4         Under both inquiries, under these unique

5    circumstances, Gallagher & Kennedy's complaint fails the          09:11:44

6    ripeness challenge.

7         If you'll excuse me.  Between the weather and a new

8    puppy and telling it no all of the time, I think I'm losing my

9    voice.  If you'll excuse me a moment.

10        THE COURT:  Sure.                                            09:11:57

11        We have something in south Texas that my seven years

12   there has gotten me every year, it's called Cedar Fever.  And

13   it's that heavy cedar pollen that blows in from the hill

14   country, and boy oh boy it does a job on you.

15        MR. LUTZ:  This time of year kills me because                09:12:18

16   everything flowers, especially when we have this much rain.  So

17   I can fully appreciate that feeling.  So I appreciate your

18   indulgence.

19        In looking at the ripeness challenge, the most

20   important point that I want to make here is that I want to make  09:12:33

21   clear that merely stating a statutory claim alleging the

22   elements of a statutory violation do not necessarily mean that

23   a case is ripe.

24        In the *Spokeo* case that's cited in our papers, the

25   Supreme Court recognized that Congress, when it legislates,      09:12:49

1    does not have the power to remove that ripeness requirement,

2    that Article III requirement.

3         And here if you look at the circumstances, Gallagher &

4    Kennedy's claims are all highly contingent and speculative.

5    Gallagher & Kennedy is essentially arguing, because it has          09:13:06

6    spent some sums under its engagement letter with RID, that it's

7    entitled to bring a CERCLA action.

8         But that argument ignores the fact that RID has

9    settled its claims, has dismissed its complaint against these

10   defendants, that G&K is acting essentially as the complaint         09:13:24

11   repeatedly states on behalf of or as an agent of RID, and that

12   under its engagement letter Gallagher & Kennedy is authorized

13   to continue to collect funds, not just from the prior

14   litigation, the RID litigation, this litigation, potentially

15   other litigations from government agencies, investors, and          09:13:42

16   others, in furtherance of its project.  It's authorized to use

17   those funds to further the project, including remediating the

18   area.  It's also entitled to basically be reimbursed from the

19   trust funds for amounts that it spends.

20        Most importantly, I think, the engagement letter and           09:14:03

21   the complaint both recognize that Gallagher & Kennedy agreed to

22   defer its compensation.  As in a typical contingency fee case,

23   Gallagher & Kennedy agreed to take upon a representation in

24   exchange for a potential large recovery at the end of that --

25             THE COURT:  Well, this was anything but a typical          09:14:23

1   contingency fee case.

2        MR. LUTZ:  I would wholly agree.

3        THE COURT:  It's the strangest engagement I've ever

4   seen.  It was perfectly legal, perfectly fine ethically, but it

5   certainly was strange.                                    09:14:33

6        MR. LUTZ:  And I agree that this is a unique

7   situation.

8        THE COURT:  I don't think there's a lawyer in this

9   courtroom that's ever seen one quite like it.

10       MR. LUTZ:  I have not in 20 years of practice.  And I  09:14:43

11  know in discussing it with co-counsel in the RID litigation, I

12  don't think any of them had either, Your Honor.

13       THE COURT:  You know, people come up with ingenious

14  ways of doing business.

15       MR. LUTZ:  Well, and part of that ingenuity also plays 09:14:57

16  a role here in the fact that by agreeing to that deferred

17  compensation and agreeing -- making that compensation

18  contingent upon a string of speculative future events, such as

19  potential other litigation against other PRPs, recovery from

20  government agencies and so forth, Gallagher & Kennedy has      09:15:17

21  rendered it impossible to know at this point in time exactly

22  what project funds are going to be recovered, and whether or

23  not their fees and their reimbursable expenses will be covered

24  under the project funds.

25            In essence, they want to sue now for their accrued  09:15:35

UNITED STATES DISTRICT COURT

1   fees, accrued time and their expenses, and then retain the

2   ability to go forward, potentially recover from others, have a

3   double recovery, and ultimately obtain -- potentially obtain a

4   windfall if their water project succeeds.

5        That uncertainty really demonstrates that there's no          09:15:52

6   direct imminent injury to a legally protectable interest at

7   this point in time.  Gallagher & Kennedy has a contract with

8   RID.  It has rights under that contract with RID.  It should

9   not be suing RID's former opposing parties for fees and

10   expenses that it should be looking to its client for,           09:16:12

11   especially when those fees and expenses are so uncertain and

12   speculative.  That simply doesn't constitute the necessary

13   injury in fact at this point in time that renders this case

14   ripe for adjudication.

15        I'd also like to point out that in its papers            09:16:25

16   Gallagher & Kennedy notes -- or states that it's not going to

17   double recovery in this case because any recoveries it receives

18   in the future from its water sales would not be considered

19   double recovery.  And I make two points in response.

20        One, Your Honor, project funds include recoveries from     09:16:52

21   other litigation, which would be a state or federal action.  It

22   includes recoveries potentially from government authorities,

23   which would also be a state or federal law.

24        And three, the water sales themselves would

25   essentially constitute a windfall, which under the case law      09:17:06

1    we've been told is improper.  CERCLA isn't intended -- is not

2    put in place to give windfalls to plaintiffs or to give them

3    damages, but rather to reimburse cleanup and remediation costs.

4          And finally I just end, Your Honor, that Gallagher &

5    Kennedy will suffer no hardship if this case -- consideration      09:17:24

6    of this case is delayed.  They're in the same position today as

7    they were when they signed their engagement letter with RID.

8    They're awaiting a contingent fee that's contingent upon a

9    number of factors which have not come to pass.

10         THE COURT:  So what exactly do you hope to gain by my        09:17:38

11   dismissing the -- or denying the motion without prejudice and

12   continuing the matter?  What is it exactly that you think is

13   going to change or make this more justiciable?

14         MR. LUTZ:  Your Honor, the only thing that would

15   really change is that we would be entitled to see at some point    09:18:04

16   in time whether or not Gallagher & Kennedy actually incurred

17   some recompensable damages, if you will.  That we would know

18   whether or not they were able to recover if their costs were

19   paid by their client, if their expenses were paid by their

20   client, if their fees were paid by their client.                   09:18:23

21         To the extent that they're paid by their client --

22   Gallagher & Kennedy would like to be treated like a contractor,

23   but we don't allow contractors to sue under CERCLA if they're

24   paid by their client.  And here the case would essentially go

25   away if Gallagher & Kennedy is successful on any of these          09:18:39

1    future contingent events.

2           Now, that being said, unless Your Honor has any

3    questions --

4           THE COURT:  No, no, no.

5           MR. LUTZ:  -- I'd just like to move briefly to the          09:18:51

6    12(b)(6) portion of the motion.  And I'd really only like to

7    talk about one issue there, which I think, after rereading the

8    briefs -- I think the briefing is fairly well done, but I want

9    to clarify one issue.  And that relates to the treatment of

10   this case under the *Chubb Insurance* case out of the          09:19:10

11   Ninth Circuit.

12          I think it's important to note, just as a general

13   matter before I talk about that, if you look at the complaint,

14   you have 108 paragraphs in this complaint.  There are three

15   paragraphs specifically dedicated to these three defendants;          09:19:25

16   paragraphs 60, 61 and 79.  All of the remaining paragraphs are

17   allegations -- kind of formulaic recitations of the elements of

18   CERCLA or generic allegations that relate to the area as a

19   whole.

20          And if you look at those allegations against these          09:19:44

21   defendants specifically, I think under the standard set in

22   *Twombly* and *Iqbal*, those allegations are just, as we say in the

23   papers, insufficient.

24          But turning to the issue -- the *Chubb Insurance* issue.

25   Throughout the complaint, Gallagher & Kennedy doesn't allege          09:20:04

1    that it has any obligation under CERCLA.  And it can't because,

2    as I pointed out, it's not a landowner who's been injured, it's

3    not a well owner, et cetera.

4           In fact, paragraph 12 of the complaint goes so far as

5    to expressly state that Gallagher & Kennedy is not a PRP.  It          09:20:20

6    says, in essence, Gallagher & Kennedy has not released any VOCs

7    to RID's wells.  So they proclaim their innocence as part of

8    this -- as part of the complaint.

9           Under the *Chubb* case, 710 F.3d 946, decided by the

10   Ninth Circuit, I think it's instructive in this case.  There        09:20:42

11   the Ninth Circuit was looking at a situation in which *Chubb*

12   *Insurance*, or the insurance company, had paid some costs,

13   reimbursed its client for costs that the client had spent in

14   cleaning up a site.

15          The insurance company then sued.  It sought                  09:20:58

16   subrogation under Section 112 of CERCLA, and it sought cost

17   recovery under Section 107 of CERCLA.

18          The Court denied the 112 motion on statutory grounds,

19   they hadn't complied with the terms of the statute, and then

20   examined the 107 claim.  And in making that claim, the              09:21:14

21   Court ultimately came down and said, no, this insurance company

22   cannot make that claim.  And the reason behind it is because

23   that insurance company was operating under an agreement with

24   its client.  And that agreement obligated it to pay its client

25   for these costs.  As a result, it had not incurred the costs of     09:21:32

1    response, even though it may have paid those costs indirectly

2    by reimbursing its client.

3         Here, Gallagher & Kennedy's in that same position.

4    Gallagher & Kennedy has a contractual obligation to its client.

5    It can withdraw from that obligation, but it has not, that                    09:21:51

6    we're aware of.  It doesn't state it has in the complaint.

7    It's obligated under that contract with its client to take

8    certain actions on behalf of the client, which it is, and is

9    now seeking to recover from these defendants for.  But, any

10   payments that it made have been made pursuant to that                         09:22:11

11   contractual obligation, not pursuant to response costs under

12   CERCLA.

13        In other words, Your Honor, Gallagher & Kennedy hasn't

14   incurred costs of response because the payments it's made have

15   not been voluntary, have not been made as a PRP, and have been                09:22:32

16   made solely on behalf of RID pursuant to its contractual

17   obligation.

18        Now, Gallagher & Kennedy cites to the *NCR versus*

19   *George Whiting Paper Company* case.  I'd just like to note that

20   if you actually review that case, it buttresses the reasoning                 09:22:53

21   in the *Chubb* case.

22        In the *NCR* case there was a subsidiary to NCR,

23   Appvion.  And through a series of corporate transactions

24   Appvion had come into being.  And at some point in time the EPA

25   had determined that Appvion was a PRP.                                        09:23:10

1      Turned out the District Court said, no, Appvion is not

2    a PRP.  Rather, its parent company, *NCR,* is a PRP.

3      And in looking at it -- but the Court looked at that

4    equitable situation.  Appvion by that point in time had spent

5    $20 million remediating things.  The Court looked at it and            09:23:27

6    said Appvion was a PRP when it spent those funds.  So we have

7    to figure out a way that they can recover those funds.  And the

8    way to do that is using Section 107, because they're a

9    voluntary payment of these funds.

10      The Court did not allow Appvion, however, to use                    09:23:43

11    Section 107 to recover indemnity obligations that it owed to

12    its parent, because under the reasoning in *Chubb*, the Court

13    recognized that principles of contract should govern those

14    rights between the parties.  And there, consistent with *Chubb*,

15    the recovery of the costs arose through Appvion's indemnity           09:24:00

16    agreement and obligations, so they weren't recoverable under

17    Section 107.

18      Here the same principle should apply, Your Honor.

19    Gallagher & Kennedy's complaint is legally insufficient because

20    Gallagher & Kennedy has incurred costs under its contractual         09:24:15

21    obligations to RID.  It has not incurred costs of response

22    under CERCLA that are recoverable under Ninth Circuit law.

23      I just point out that as a policy matter, that makes

24    perfect sense.  If we allow this unique circumstance to

25    proceed, as both the *Chubb* court and *NCR* court recognized, that   09:24:38

1    theory would allow -- that theory would undermine the

2    contribution protection that exists for at least two of these

3    defendants.  It would provide no incentive for any defendants

4    to settle if they thought that they were going to subsequently

5    be sued by the contingency fee attorney representing the          09:25:00

6    opposing party.  It would provide no incentives to a

7    contingency fee attorney to ever agree to dismiss its fees,

8    because there would be no risk, no down side to that

9    contingency fee attorney.  And it would essentially allow an

10   attorney to circumvent CERCLA and to circumvent the             09:25:17

11   contribution and allocation protections that are inherent in

12   Section 113 and in CERCLA generally to go after defendants that

13   may have already settled with a party that was actually a PRP.

14        For those reasons, Your Honor, the complaint that

15   Gallagher & Kennedy has set forth are -- it's just facially      09:25:35

16   deficient.  It does not set forth a legally cognizable and

17   plausible cause of action and should be dismissed.

18        If Your Honor would like, I'm happy to discuss any

19   other parts of the briefing, including the defense specific,

20   but if not --                                                    09:25:53

21        THE COURT:  No, I think you were correct when you said

22   that the briefing was more than adequate.  I've never had bad

23   briefing here in Phoenix in any of the cases I've presided over

24   involving the water -- I mean, when I started in Arizona in

25   19 -- sitting in 1989 with Judge Browning as chief, in some of   09:26:12

1   those cases I had some pretty bad briefing, but not these

2   cases.

3           MR. LUTZ:  Well, I'm glad to hear that, Your Honor.

4           So without any questions, Your Honor, I'll sit down

5   and allow plaintiffs to have their say, and request an          09:26:28

6   opportunity to respond.

7           THE COURT:  Sure.

8           MR. LUTZ:  Thank you.

9           MR. THOMAS:  Excuse me, Your Honor, can I take 30

10  seconds just to supplement the answer to your question about     09:26:38

11  what might be different?

12          THE COURT:  Yes.

13          MR. THOMAS:  Namely --

14          THE COURT:  Why don't you come up here so that the

15  reporter can make sure she hears you.                            09:26:45

16          MR. THOMAS:  Thank you, Your Honor.  Chris Thomas on

17  behalf of the City of Phoenix.

18          In further answer to your question about, if you grant

19  dismissal of this action what might happen hereafter that would

20  obviate the need for this litigation.  And what might happen is  09:27:01

21  that if it succeeds in its effort to demonstrate a water right

22  in the water rights litigation before Judge Tuchi, or succeeds

23  in its efforts at the --

24          THE COURT:  He's got the other -- he's got the other

25  case, I think, doesn't he?                                       09:27:21

1        MR. THOMAS:  He does, indeed.  And my understanding of

2   the status right now is that trial is pending on some issues

3   about whether the contract between RID and G&K was intended to

4   incorporate certain aspects of the Reclamation Act that

5   would --                                                          09:27:42

6        THE COURT:  How long has that case been pending?

7        MR. THOMAS:  Oh, it's been a couple three years.

8        THE COURT:  That long.

9        MR. THOMAS:  Mr. Kennedy may know.  And I'll look

10   before I come up again and let you know.                          09:27:51

11        But in any event --

12        THE COURT:  Anyway, they wanted me to take that.  I

13   said no.

14        MR. THOMAS:  That was probably --

15        THE COURT:  This one's fine, but no.                         09:27:59

16        MR. THOMAS:  Probably a good call.

17        In any event --

18        THE COURT:  Judge Tuchi is a great judge.  He'll do a

19   wonderful job.

20        MR. THOMAS:  In any event, you know, the outcome of         09:28:08

21   that litigation will affect whether G&K needs to continue

22   arguing that extraction and treatment of groundwater is

23   necessary.  And --

24        THE COURT:  All the wells have not been taken care of,

25   have they?  Have all the wells been --                           09:28:24

—— CV-16-4447-PHX-DAE – February 21, 2019 ——

1      MR. THOMAS:  Actually I will be addressing that in

2  some length when I talk about the 56(d) issue.  But you do have

3  in front of you, I think it's attachment 3 to one of our recent

4  pleadings.

5      THE COURT:  I don't have it in front of me -- I guess          09:28:38

6  I do.

7      MR. THOMAS:  If you give me a moment I want to grab

8  that while I'm on the topic.

9      THE COURT:  Let's not do 56(d) now.

10      MR. THOMAS:  Okay.  Yeah, regarding the wells,              09:28:48

11  Your Honor, you'll see a couple figures there.  RID has two

12  canals; the Salt Canal to the north, the Main Canal to the

13  south.

14      Most of the flow in the Main Canal is City of Phoenix

15  23rd Avenue wastewater sewage effluent.  Neither RID nor G&K      09:29:03

16  intends to convert water in the Main Canal for drinking water

17  use in the future.  What they do propose is to build a new

18  water supply pipeline at the end of the Salt Canal.

19      And so there are wellhead treatment units on four

20  wells at the moment.  Three of those wells, however, discharge   09:29:31

21  into the Main Canal, which will never be a drinking water

22  source.

23      There's a well, 114, that's at the eastern boundary of

24  the Salt Canal.  The Salt Canal is the one to the north.  That

25  well has collapsed, and as of January 7th RID has proposed to    09:29:46

—CV-16-4447-PHX-DAE – February 21, 2019—

1    DWR that it be replaced.

2         I will reserve the rest of that for the 56(d) issue --

3         THE COURT:  All right.

4         MR. THOMAS:  -- if you'd like.

5         THE COURT:  All right.  I will note though that          09:30:02

6    the -- it's very disappointing that, particularly for my law

7    clerks, that the names of these various spots are nowhere near

8    as colorful and lovely as the ones we had in Pinal Creek.  We

9    had some doozies of names of those reclamation areas.

10        MR. THOMAS:  We can work on that, Your Honor.  Thank       09:30:24

11   you very much.

12        THE COURT:  Salt Creek is about as close as you get,

13   but that doesn't even cut it.

14        MR. THOMAS:  Thank you.

15        THE COURT:  All right.  Good morning.                     09:30:32

16        MR. DANGERFIELD:  Good morning, Your Honor.  Mark

17   Dangerfield oh behalf of Gallagher & Kennedy.

18        THE COURT:  Yeah, it's good to see you again.

19        MR. DANGERFIELD:  So responding to the motion to

20   dismiss arguments, let me see if I can frame what's really gone  09:30:49

21   on here, Your Honor.

22        What the defendants would like you to do, now that the

23   RID action has been dismissed, they would like you to dismiss

24   this action so they would not face anybody requiring them, the

25   PRPs, to actually pay for this cleanup.                        09:31:08

UNITED STATES DISTRICT COURT

23

1          It's not disputed -- well, at least it's not disputed

2    by the Court.  Maybe they still dispute it -- that Gallagher &

3    Kennedy is the one that incurred response costs.  Those

4    responses costs were determined by the Court to have been

5    substantially compliant with the National Contingency Plan.          09:31:29

6          And for most of the last six years Gallagher & Kennedy

7    has been funding and -- the cleanup of the area by carrying out

8    the remedy imposed by or agreed by ADEQ.

9          So that's the background.

10          Somebody incurred those costs.  You determined in the      09:31:56

11    RID action that it wasn't RID and that it was G&K that incurred

12    those costs.  Under CERCLA anybody that incurs response costs

13    can file an action to be reimbursed for those costs, and that's

14    what we've done here.

15          From one point of view the argument of the defendants,      09:32:16

16    the unstated argument is, even though we may be PRPs, and even

17    though we may be liable under CERCLA, we should go free because

18    Gallagher & Kennedy has this odd arrangement that it's going to

19    pay the remediation costs.

20          Well, let's talk about that odd arrangement,      09:32:39

21    Your Honor, for just a minute.

22          It's, as you astutely observed, not like any other

23    contingency fee --

24          THE COURT:  I don't think you have to be very astute

25    to figure that out.      09:32:55

—— CV-16-4447-PHX-DAE – February 21, 2019 ——

1        MR. DANGERFIELD:  What it really was --

2        THE COURT:  But thank you for the compliment.  You

3   know, federal judges grab them when they can, believe me.

4        MR. DANGERFIELD:  Well, what that plan is, what that

5   engagement is, is a creative way to take care of environmental      09:33:08

6   remediation in a way that the private parties can do it without

7   the government having to do it.

8        Now, one of the things you heard Mr. Lutz say, and one

9   of the things they say in their papers and they continue to

10  repeat, is that Gallagher & Kennedy really hopes to get some        09:33:27

11  great windfall at the end of this, and if they do, well, that

12  would be unfair to the PRPs.

13       It wouldn't be.  First of all, the odds of -- the

14  opportunity for G&K to get a, quote, windfall, if that ever

15  happened, it would be far in the future.  But more importantly,     09:33:47

16  it's irrelevant.

17       RID is an irrigation company.  It's a water company.

18  Has the right to sell water.  And it had that right independent

19  of this litigation.  And if RID is successful at selling water,

20  irrigation water or drinking water, that's nothing that should      09:34:08

21  help or hurt the PRPs.  They have no stake in that.

22       THE COURT:  Well, nothing has been sold yet.

23       MR. DANGERFIELD:  Correct.  Nothing has been sold yet.

24       THE COURT:  I haven't seen any G&K old-fashioned

25  bottled water in the stores, yet.                                   09:34:25

UNITED STATES DISTRICT COURT

1      MR. DANGERFIELD:  Correct.  We haven't made a dime

2  from it.  And there's no indication we will in the near future.

3      But my point is, there's nothing wrong with making a

4  profit in compliance with the law.  And the fact that a company

5  makes a profit off of its business doesn't mean that the PRPs        09:34:40

6  get the benefit of that.

7      THE COURT:  Well, let's turn to the crux of the -- if

8  you boil away all of the, you know, ancillary arguments -- not

9  that they're not important, they are.  But if you get right to

10 the heart of it, they're suggesting that what you're trying to      09:35:02

11 do, in essence, or your client is trying to do, is to recover

12 from them your contingency fee.  That's what they're arguing,

13 the legal fees, that's what you're trying to argue.  And that

14 you will then -- and that your client then will recover the

15 profit which was part of those fees, the reason the fees          09:35:23

16 were -- fee agreement was set up the way it was.

17     So you have on the one hand G&K gaining a benefit here

18 from ultimately down the road, should it come to pass,

19 selling -- being able to sell the water, which would enure to

20 their benefit.  And then over here, getting back from these        09:35:46

21 folks what essentially they claim are G&K's fees.  And that's

22 where the double recovery comes in from their perspective.

23     I think I've said it as simply as I can.

24     MR. DANGERFIELD:  Well, let me respond to that.

25     In the normal --                                              09:36:06

1          THE COURT:  So why aren't these fees?

2          MR. DANGERFIELD:  These are -- that's not the issue.

3     The issue is, are they response costs?

4          THE COURT:  They're attempting to make it the issue.

5          MR. DANGERFIELD:  Sure, that's their spin on it.

6          But in the normal -- in the normal CERCLA action,

7     Your Honor, somebody pays out response costs.  And once they

8     do, once they've spent one dollar of response costs, as the

9     case law suggests, they can file an action under CERCLA 107(a)

10    to recover that cost.

11         Now the fact that some day they may recover that cost

12    from another PRP through settlement, that's not -- that's not

13    something the Court considers in the 107 action.  It simply

14    considers, was there response costs that were required?  Did

15    this entity put forth some responses costs?  If so, then the

16    PRPs are liable for that cost.

17         To prevent double recovery, that is taken care of in

18    the contribution process.  Because a PRP that -- let's say we

19    file an action, we -- simplify things -- we request one dollar

20    of costs.  Mr. Lutz's client pays that $1 to us.  And then

21    assuming he thinks he's not liable or his client's not liable,

22    he would initiate a contribution action to another PRP.  And in

23    assessing that, the Court would look at all these issues of,

24    gee, has there been any double recovery.

25         That's how that is played out.  So no PRP -- no PRP,

1  under the way this is set up, is going to have to pay twice for

2  the remediation.  That's the key, Your Honor.

3          And G&K is not going to get paid twice for the

4  remediation, because we're going to get either paid or not paid

5  by a party.  And there's going to be contribution actions that

6  will balance that out among the PRPs.

7          The fact that we might at some point earn some profits

8  from the sale of drinking water, that's not a double recovery,

9  if we ever do.  That's not a double recovery because it's not a

10  recovery -- that's a recovery just from a private business

11  transaction.  Double recovery relates to situations where,

12  under state or federal law, you recover under one statute and

13  recover under another statute.

14          The fact that you may make some profits from a private

15  business, that is not a double recovery, and there's no law

16  that they've cited that shows that.

17          So no PRP is going to pay twice, that's the key here.

18          We're not simply trying to recover our -- we're not at

19  all trying to recover our litigation costs.  The record is

20  clear that G&K has paid out already of its own funds for the

21  remediation that's been taking place.  I mean, I'm talking cash

22  dollars to pay for the consultants to help design the plans.

23  And cash dollars to help pay for the actual remediation that's

24  been going on for six years.  G&K itself has paid for at least

25  $450,000 of that.  It's more than that, but I think that's a

09:38:18

09:38:40

09:39:02

09:39:20

09:39:46

1    figure you've seen in the papers.

2          And in addition to that, G&K attempts to collect

3    project funds, as they're called, collect from others, that it

4    can then use to do the remediation.  That's the genius of the

5    plan, is that private parties can try and help take care of the        09:40:08

6    remediation.

7          But we're not going to get paid twice for that

8    remediation.  And the PRPs are not going to have to pay twice.

9          Let me address the issue they've called ripeness.

10         Ripeness simply means, have you incurred some injury?        09:40:31

11   The case -- the case law under CERCLA is very clear, once

12   you've paid out a dollar toward remediation, you have incurred

13   an injury.  You can bring an action.

14         Now there's just -- it's incredible that they would

15   attempt to dispute that G&K has not paid out a dollar in        09:40:54

16   remediation costs.  Because in the RID litigation they stood

17   before you and argued that G&K has incurred these costs, RID

18   didn't.  And you held exactly that.

19         So G&K has, in fact, incurred an injury here.

20         The mere fact that at some day we might get reimbursed        09:41:16

21   for that, that's true of any innocent landowner who pays money

22   to remediate his property, and then eventually sues PRPs to get

23   that money back.  The Court wouldn't say, well, Mr. Landowner

24   suing to -- yes, you've cleaned up your property, but you

25   really haven't been hurt yet until I determine whether the PRPs        09:41:43

1    reimburse you for that.

2           And, of course, if that were the case, no PRPs would

3    ever step forward to reimburse them, because they would argue,

4    you don't even have a claim.  It's a circular argument,

5    Your Honor.                                                    09:42:01

6           It's always the case that someone who cleans up

7    property that he didn't pollute has the right to get reimbursed

8    that from the PRPs.  But that doesn't mean that you have to

9    wait to see if he gets reimbursed to a judge if he really had

10   an injury.  He has an injury under CERCLA the moment he pays   09:42:18

11   out one dollar of remediation costs.

12          THE COURT:  So let's assume that you prevail

13   ultimately and you, on behalf of your client, recover these

14   funds, and then your client then recoups from another source

15   the funds that were -- or a good part of the funds that were   09:42:41

16   recouped from the -- you know, the defendants in this action.

17   Would they have some sort of subrogation action against you at

18   that later date to recover their money back?  I don't think so.

19          MR. DANGERFIELD:  I'm not sure what you -- I'm not

20   sure what your positing.                                       09:43:03

21          RID is out of the case, they can't recover anything

22   from anybody.

23          THE COURT:  But you're seeking money from these guys.

24          MR. DANGERFIELD:  Yes.  We are seeking funds.  RID

25   can't seek funds.                                              09:43:16

1          THE COURT:  I know, you're seeking funds.

2          So let's assume you prevail and you get the money.

3     But they're saying you're going to get the money from another

4     source later, so that's your double recovery.  So then what

5     happens if that, in fact, takes place?  Do you just get the          09:43:30

6     windfall of the double recovery if they're right, or do they

7     have some cause of action to get it back at a later time?

8          MR. DANGERFIELD:  No, Your Honor, there's no scenario

9     under which we would be allowed to get a double recovery in

10    that sense.                                                          09:43:44

11         THE COURT:  All right.  Well, I'll let counsel address

12    that when he gets back up.

13         MR. DANGERFIELD:  Yeah.

14         THE COURT:  Because I think he has a different view of

15    it.                                                                  09:43:52

16         MR. DANGERFIELD:  Well, here's the way this would

17    proceed:  As we've moved for summary judgment, we would -- if

18    all went well, we would -- there would be an order issued

19    finding that we had expended some costs toward remediation, and

20    that the -- one or more of the defendants were liable for that.     09:44:09

21         Then there would be litigation -- at that point there

22    would be litigation over, all right, what costs did we put out,

23    and what costs -- for which costs are they liable?  At which

24    point they would be looking for other PRPs to bring into the

25    litigation.                                                         09:44:28

1    And before all of that was sorted out, you, as the

2  court, would have to determine how that all flows.  So you

3  would be there as a check to make sure we're not getting double

4  recovery.  That's how that works.

5    THE COURT:  Well, let me –– you know, I taught federal

6  courts for 34 years, so I can't help myself with my ridiculous

7  hypotheticals.  But let's assume in a purely hypothetical

8  situation that a company suffered a loss, and they had an

9  insurance policy, and the insurance company had denied coverage

10  and said, you're not covered for that.  So they're battling the

11  insurance.

12    Meantime they are directly suing the –– let's take all

13  the state laws out of here that have to do with mandatory

14  subrogation and all that.  They're suing party X who caused the

15  damage.  They recover against party X in the meantime while

16  this thing is going on with the insurance company.  And they

17  recover party X –– from party X say $5 million.

18    In the meantime then it's found that the insurance

19  company was, in fact, responsible and they had to reimburse.

20  And so they reimburse $5 million to the aggrieved party, who's

21  now sitting with $10 million.

22    Now normally, of course, the insurance company would

23  have a clause and they'd get the $5 million directly.  But

24  let's assume that they stupidly don't.  And believe me, I've

25  had some whacky insurance policies recently, especially in oil

1   and gas cases.

2          So, would the -- either the insurance company be in a

3   position to say, wait a minute, they already got reimbursed,

4   or this guy over here say, you know, we're entitled to our

5   money back because now they got the money from the insurance          09:46:28

6   company so they're not entitled to get money from us.  And if

7   anybody's entitled to get money from us, it's the insurance

8   company.

9          So --

10          MR. DANGERFIELD:  Well, our case -- with respect, I          09:46:37

11   believe our case is a little different than your hypothetical.

12          THE COURT:  I know it's a bit different.  But I'm just

13   trying to get across to you --

14          MR. DANGERFIELD:  Sure.

15          THE COURT:  -- my -- what I'm thinking.                      09:46:47

16          MR. DANGERFIELD:  What you're thinking through.

17          See, in your hypothetical there are two different

18   entities that are related to the plaintiff, we'll say.

19          THE COURT:  Sure.

20          MR. DANGERFIELD:  And that would be sort of like RID          09:46:59

21   and G&K.

22          THE COURT:  Right.

23          MR. DANGERFIELD:  And both of them get paid the

24   response costs.

25          THE COURT:  Right.                                           09:47:06

1          MR. DANGERFIELD:  That can't happen here because

2    you've already dismissed RID and said they're not going to get

3    anything on the costs.  And so the only party left is G&K.

4          And you're in a position to know -- because of the

5    litigation, you're in a position to control, once we get to the          09:47:23

6    cost aspect of this, who gets what.  And the equities of that

7    are sorted out in the contribution action, not in the 107

8    action.

9          And so there's a check on that, provided by the

10   statute, to ensure that there is no double recovery.          09:47:44

11         THE COURT:  Judge Tuchi's action, does that impinge on

12   this in any way?

13         MR. DANGERFIELD:  No, Your Honor, I don't think so.

14         THE COURT:  It's divorced; right?

15         MR. DANGERFIELD:  I think it has nothing to do with          09:48:01

16   this.

17         THE COURT:  That's what my thinking was.  But I

18   haven't paid any attention to his action.

19         MR. DANGERFIELD:  I think it has nothing to do with

20   our 107 action here today.          09:48:08

21         They have -- as you know, they have this theory that

22   we're -- G&K is in this because there's going to be some --

23   they like to call it a windfall.  But --

24         THE COURT:  Well, I have nothing against lawyers

25   getting paid.  I used to like to get paid.          09:48:25

34

1          MR. DANGERFIELD:  I would be happy to get a windfall.

2   But that's not the issue here today.

3          The issue is, CERCLA 107(a), did we incur response

4   costs?  Yes, we did.  Therefore, we have a case that's ripe for

5   review.  And our complaint pleads -- our lengthy complaint        09:48:41

6   pleads a very complete case indicating that we have a cause of

7   action under 107(a).

8          THE COURT:  Okay.  Thank you very much, counsel.  I

9   really do understand your argument.

10         MR. DANGERFIELD:  Okay.  Thank you.                         09:48:58

11         THE COURT:  It falls right in line with your papers.

12         MR. LUTZ:  Your Honor, I'd just make a few brief

13   points in response to Mr. Dangerfield.

14         First, I'd like to point out, factually I think the

15   assertion that the Court has already determined that the fees    09:49:17

16   and expenses paid by G&K have been incurred is incorrect.

17   Those fees, by the time Your Honor issued his November 2016

18   order, had been dismissed from the case because they had been

19   determined they were not incurred by RID, they were not at

20   issue.  G&K was not a party to that suit.  Those issues just     09:49:34

21   were simply never argued.

22         Secondly -- the second point that I'd like to make

23   relates to double recovery, which Your Honor seemed interested

24   in.

25         And I would argue that Mr. Dangerfield's position here     09:49:46

1    proves the point.  Mr. Dangerfield is essentially saying we

2    can't double recover because there would be this 107 suit, the

3    defendants would turn around and third party in other parties,

4    and then you would determine this.

5         Under the unique –– I'm not going to call it a scheme.    09:50:01

6    Under the fee structure set up here, that's not necessarily

7    true.  Not everything is in this case.  Under the project funds

8    definition, those funds include litigation against other

9    potential PRPs, of which there are many out in that area,

10   recoveries from government agencies, all of which would be    09:50:19

11   considered a CERCLA recovery.

12        And as a result, this Court may never even know that

13   Gallagher & Kennedy has sued some other PRP and recovered those

14   responses costs.  It may not come up in that suit.  I would

15   hope it would, but it may not.                                09:50:37

16        Unless there is some sort of continuing jurisdiction

17   that takes account of Gallagher & Kennedy's future contingent

18   fees and its recovery, the possibility of double recovery is

19   highly probable here.

20        I'd also like to point out, Your Honor, as Mr. Thomas    09:50:51

21   here is scribbling next to me and obviously wants me to make an

22   important point ––

23        THE COURT:  He's definitely afraid I'm going to cut

24   him out.  He wants to make sure that his horse is blocking the

25   barn door.                                                    09:51:06

1    MR. LUTZ:  Well, you know, I'm going to probably turn

2    the time over for him for a moment to discuss some of these

3    issues.

4        But I'd also point out that the water sales,

5    Your Honor, in this case are unrelated to the litigation, so         09:51:16

6    they would never be involved in this litigation.

7        And to the extent, under basic management, the Court

8    said, we're not going to give plaintiffs a windfall under

9    CERCLA –– and I think the CERCLA cases are fairly consistent in

10   saying, we're not giving you damages, we're paying you for          09:51:30

11   costs of response that have been incurred.

12       To the extent those all happened, there would be a

13   double recovery and a windfall to Gallagher & Kennedy.

14       And as a result of that, because those events are also

15   contingent and so dependent upon future events, the case is        09:51:45

16   simply not ripe for decision and should be dismissed upon that

17   ground.

18       Two other points I think that I'd like to make.

19       One, I heard Mr. Dangerfield say that the defendants'

20   theory here is essentially that they get to go free.  I'd         09:52:00

21   respond to that by saying, these defendants have already

22   settled their liability with RID and paid RID.  So contrary to

23   that –– to Mr. Dangerfield's contention, these defendants are

24   not going free.  They've also cleaned up their sites and taken

25   steps to remediate the property out there.                         09:52:18

—— CV-16-4447-PHX-DAE – February 21, 2019 ——

1    Finally, Your Honor, ultimately the issue here, it

2  seems to me, Mr. Dangerfield is conflating contribution actions

3  with recovery.  And that's not the case.  Under CERCLA, if

4  there was a settlement, that would be set off under Section

5  114.  Contribution would have nothing to do with whether or not          09:52:40

6  the plaintiffs had double recovered their costs.

7    This is a case exactly like *Chubb*.  I think his

8  argument reinforces that concept in my mind, because here

9  Gallagher & Kennedy, as Mr. Dangerfield said, has this business

10  investment.  It has this purported $450,000 in costs that it's         09:52:57

11  paid to some consultants, we don't really know whom, that

12  should be treated as a reimbursable expense by RID that's

13  recoverable under the engagement letter.

14    It would not be recoverable under *Key Tronic*.  And

15  I'll let Mr. Thomas speak about that.  But they have this             09:53:18

16  contractual obligation.  They made those payments pursuant to

17  that contract.  They did not separately incur those costs of

18  response.  They're representing their client.  They're

19  expending their accrued time and their reimbursable expenses on

20  behalf of RID, not separately incurring those costs.                 09:53:35

21    And I think under the Ninth Circuit precedent in

22  *Chubb*, the case should be dismissed for failing to state a

23  plausible and legally sufficient claim.

24    With that, Your Honor, I'm going to allow -- turn my

25  time over, if you will allow, to Mr. Thomas to make a point          09:53:57

1    with respect to *Key Tronics*.

2         MR. THOMAS:  With your indulgence, Your Honor, briefly

3    I'd like to mention, we need to be clear about what G&K is

4    seeking.  And putting aside the $450,000 of real cash money, as

5    Mr. Dangerfield put it, that they raised in response to our          09:54:16

6    motion to dismiss, everything else that they've sued for is

7    accrual revenue, attorney time that they've invested in this

8    case.

9         And in the context of the CERCLA, as you know, the

10   Supreme Court's *Key Tronic* case looked at the issue of whether     09:54:36

11   private parties' attorney's fees were recoverable as

12   enforcement costs under CERCLA.  And the Supreme Court said, no

13   as to regular litigation costs, but possibly as to certain

14   costs tied to implementation of the remedy and the like.

15        So what G&K is suing defendants for is about 15 or            09:54:55

16   $20 million worth of attorney time, according to them, plus

17   this mystery $450,000.

18        In response to your perfectly logical questions about

19   how to avoid double recovery under this strange arrangement,

20   the argument that Mr. Dangerfield made was, well, it's not        09:55:20

21   double recovery because what we recover from defendants in this

22   case will be *Key Tronic* eligible response costs.  What we might

23   recover some day if we succeed in selling drinking water and

24   are entitled to a share of the profits under our agreement with

25   RID, that's a business investment.                                09:55:44

1          The same investment of attorney time can't

2     simultaneously be *Key Tronic* eligible response costs and a

3     business investment unrelated to *Key Tronic*.

4          Thank you.

5          THE COURT:  Counsel, before you run back, do you want      09:56:02

6     to argue the other motion, 56(d)?

7          MR. THOMAS:  You know me, I'd be happy to argue all

8     day.

9          THE COURT:  Well, I know that.

10          MR. THOMAS:  Let me pick up where I left off briefly      09:56:13

11     with some of the exhibits.  Let me make briefly two points.

12          The relief sought by G&K here is similar to the relief

13     sought by RID in the prior litigation.  They've asked, for

14     instance, that liability be determined to be joint, that there

15     be no divisibility or reasonable apportionment available, and      09:56:40

16     that discovery into those issues would be futile.

17          We've obviously had no discovery here in this case.

18     When the prior case was settled and ultimately dismissed, we

19     were about four months away from the deadline for completing

20     fact discovery.  The affidavit -- or declarations of counsel      09:57:04

21     that are in our materials detail a number of the then pending

22     items of fact discovery that were abandoned after the

23     settlement.  Those included the depositions of Dave Kimball,

24     Jr., and his son Stuart who have been involved in the planning

25     of the remedy, the G&K firm itself via 30(b)(6), the RID      09:57:30

1    30(b)(6) deposition.  So more than just the proposed

2    depositions of the two Kimballs.

3         There's a wealth of fact discovery that was not

4    completed.  I think in our request we suggested that if the

5    motion to dismiss is not granted, that four months would                    09:57:57

6    suffice for completion of fact discovery, if we wanted to pick

7    up where we left off in the initial case.

8         We never got to the expert phase in the underlying RID

9    case, as you know.  And we had suggested in our status report

10   with Judge McDonald that we could probably complete expert                  09:58:22

11   discovery in a year or so.  We still believe that there should

12   be -- we should finish the fact discovery before we have

13   experts issuing opinions.

14        Having said that, there are declarations from Steve

15   Johnson and Scott Warner who explain in some fulsome detail              09:58:42

16   what mechanisms are available in their judgment to determine

17   whether divisibility of harm is available or the costs can

18   otherwise be reasonably apportioned.

19        As you know, in the *Burlington Northern* case the

20   Supreme Court said, CERCLA liability is not supposed to be              09:59:05

21   automatically joint.  You lower courts have been ignoring the

22   restatement, and either divisibility or apportionment

23   sufficient to defeat joint liability can be determined based

24   upon the simplest of factors.

25        And granting us relief in this instance would be              09:59:28

41

1    essentially identical to what you did in the underlying case,

2    when RID similarly and prematurely asked for summary judgment

3    on divisibility, joint liability, necessity, all issues that in

4    that case you determined had to be evaluated with the benefit

5    of expert testimony, and which has not been undertaken in          09:59:53

6    either case.

7              Last point, just on the issue of liability.  The, you

8    know, if you've incurred one dollar of recoverable response

9    costs you're entitled to seek declaratory relief.  That is true

10   as far as it goes, but this -- that doctrine typically gets        10:00:15

11   applied in cases, including a few I've handled, where you've

12   got a single site like a landfill, if you spend a dollar on

13   cleanup of a landfill, you're entitled to determine whether

14   people whose hazardous substances were disposed of at that site

15   are liable parties.                                                 10:00:38

16             But we resolved in the earlier case, and RID conceded,

17   that this is a two-site case.  And so a determination of

18   liability as to parties must include an evaluation of whether

19   their alleged hazardous substance releases made it to the

20   capture zone of any of the RID wells.                              10:01:02

21             If you have the map that hopefully you've got in front

22   of you.

23             THE COURT:  I have.

24             MR. THOMAS:  Let me get back to where we were when I

25   started.                                                           10:01:14

1          Again, your incurred costs rulings were a bit alarming

2    to the City because it was clear that we had not --

3          THE COURT:  Where are you?

4          MR. THOMAS:  I'm sorry?

5          THE COURT:  Where are you?                              10:01:27

6          MR. THOMAS:  The first one that shows the proposed

7    pipeline location.

8          THE COURT:  Yeah, I've got that.

9          MR. THOMAS:  I'd just like to point out that the City

10   obviously didn't go a good job of rebutting the contentions in   10:01:39

11   the earlier case that this is some huge, dangerous problem that

12   we're ignoring.  And let me run you through some of the facts

13   that we never really got to because we were fighting so long

14   about disqualification and other preliminary issues.

15         But if there will ever be drinking water use made of     10:01:58

16   any water pumped by the RID wells, that will be at some point

17   in the future.  As we sit here today, that water is used only

18   for irrigation, and it's fit for that use without any treatment

19   whatsoever.

20         THE COURT:  In the military we used to call it           10:02:15

21   non-potable water.

22         MR. THOMAS:  And as you might imagine, and as

23   Mr. Peterson of Synergy, the RID consultant testified, not much

24   appetite for surveying drinking water from the Main Canal,

25   which is dominated by flow from the sewage treatment plant.  So  10:02:34

1    that's off the table entirely.

2          And by the way, three of the wellhead treatment units

3    that the Spinnaker firm paid for are on wells that discharge to

4    the Main Canal.  We think that's a necessity issue, of course,

5    since that's never going to be used for drinking.                    10:02:56

6          But back to the Salt.  There are ten or so wells that

7    discharge to the Salt Canal you can see up to the north.

8          THE COURT:  I looked at it.

9          MR. THOMAS:  The only well that ever had wellhead

10   treatment on the wells that discharge to the Salt was 114.  114      10:03:12

11   has collapsed a couple years ago.  It's inoperable.  It's going

12   to be abandoned and replaced.

13         Additionally, even when it was operating, 114 was the

14   most highly-impacted well.  But the proposal by RID and by

15   Synergy, which is described on the next two pages, is to take        10:03:35

16   the combined flow of the Salt Canal, somewhere near 81st

17   Avenue, and connect that to a water pipeline once that pipeline

18   is built.

19         And so the RID folks and G&K have done a good job of

20   playing out that water in the aquifer today in some areas           10:04:03

21   exceeds the drinking water supply.  What we did not address in

22   the earlier case, and we would love to address, is the fact

23   that under CERCLA you have this complicated system for

24   determining cleanup standards, applicable or relevant and

25   appropriate requirements, to the ARARs is the bad acronym.          10:04:27

1          It is common in Superfund remedies for drinking water

2    standards to be considered as cleanup standards.  That's been

3    pointed out repeatedly by the G&K firm, entirely accurate.

4    What's been completely ignored though is that also when you're

5    evaluating cleanup standards, or ARARs, you also need to                10:04:47

6    consider what the point of compliance would be where those

7    standards need to be met and when.

8          And obviously drinking water standards apply under the

9    Safe Drinking Water Act at the tap, so that when you turn on

10   the tap, the water has to be in compliance with a bunch of             10:05:05

11   numeric standards.  Phoenix obviously does that with respect to

12   the 1.7 million drinking water customers we have.

13         According to -- so there was an unresolved issue,

14   never been decided by the agencies, about, if we're

15   presupposing that drinking water standards should be the              10:05:28

16   cleanup standards for what's pumped by RID, A, we need to look

17   at when that drinking water use will be.  If it's 30 years

18   hence, it doesn't make a lot of sense to spend $2 million a

19   year to treat irrigation water to drinking water standards.

20         And additionally, if you look at the last chart, even           10:05:46

21   while 114 was contributing to the combined flow in the Salt

22   Canal, as of 2015, which is the last time we had any data

23   regarding the level of solvents of UFCs in the Salt Canal,

24   prior to the point where Synergy suggests that some day we

25   connect the Salt Canal's combined flow to a future water              10:06:16

UNITED STATES DISTRICT COURT

1    pipeline, even without treatment it's pretty darn -- it was

2    pretty darn close as of 2015 to drinking water standards.

3            We think that's another necessity issue that would

4    need to be evaluated in the Rule 56(d) context, and also in my

5    judgment explains why both RID and Gallagher & Kennedy objected          10:06:36

6    to the City's subpoena to collect samples of the water quality

7    in the Salt Canal.  If the water in the Salt Canal today, prior

8    to this proposed interconnection point, is drinking water

9    quality without treatment, then that's fatal to their argument

10   under the law for a state law exemption from the ground water          10:07:01

11   code.

12           Thank you.

13           THE COURT:  Okay.  Counsel, would you like to respond?

14           MR. DANGERFIELD:  Yes, Your Honor.  Thank you.

15           Mr. Thomas made it clear in his argument that what          10:07:21

16   they want to do is revisit again the decisions you made not all

17   that long ago in the RID action about whether, in fact, the

18   remedy that is being put into place here, the remedial action,

19   actually does comply with the NCP and whether it really is

20   necessary.          10:07:45

21           Now that issue's been decided, Your Honor.  It's

22   decided -- you can't decide it anew in this case because it's

23   exactly the same remedial action.  It's remedial action going

24   forward under the exact same ADEQ approved plans.  The ADEQ

25   approved feasibility study, the ADEQ certified operation and          10:08:05

CV-16-4447-PHX-DAE – February 21, 2019

1     maintenance plan.  This is all going forward exactly as ADEQ

2     requires us to do under these approved plans.  And the

3     remedial objectives for the ADEQ approved feasibility study

4     included the remediation of the water to drinking quality

5     standards.                                                      10:08:30

6            Now, you specifically considered that, because they

7     made this -- Mr. Thomas made that same argument in the RID

8     case.  In fact, he didn't like your initial ruling so they

9     moved to reconsider that ruling.

10           And in your decision regarding that, you specifically    10:08:48

11    addressed that issue.  And what you concluded was that there

12    was nothing inappropriate with remediating the water to

13    drinking water standards.  In fact, you said that's good,

14    because it takes out more contaminants.  And that's what the

15    objective here is, is to try and remove the contaminants from   10:09:08

16    the WVBA WQARF Site.

17           So, their discovery that they want to take, as

18    Mr. Thomas just admitted, is to revisit that issue.  We don't

19    think that should be allowed, Your Honor.  It's been decided.

20    It's done.                                                      10:09:31

21           And moreover, we're proceeding under ADEQ approved

22    plans that -- we can't go back to ADEQ and say, gee, we don't

23    want to do this because we really don't think it's necessary

24    anymore.  That ship has sailed.

25           So any discovery relating to -- for example,             10:09:51

1   Mr. Thomas says, we would like to take water samples and take

2   discovery to see if maybe the water's already clean enough.

3   Well, Judge, let's assume that it is.  Let's assume they took

4   samples and said, ah-hah, it's already to drinking water

5   quality.  That wouldn't change our lawsuit.  Our lawsuit is to          10:10:12

6   recover past response costs to start with.  And those response

7   costs were incurred based on -- after 20 years of ADEQ

8   investigation.

9          And ADEQ came up with a plan that was approved, after

10   a lot of public meetings -- you talk about this in your NCP          10:10:33

11   order -- after a lot of input from all the stakeholders, after

12   a lot of input from ADEQ.  And those plans were decided and put

13   into place.  And that's the remediation that has been carried

14   out off and on as funds permitted for the last six years, and

15   is still being carried out.          10:10:58

16          So current water quality doesn't impact the past costs

17   that have already been incurred.

18          What our motion for summary judgment asks the Court to

19   do is simply decide a question of liability, that these three

20   PCPs are liable for the response costs.          10:11:14

21          Now what particular response costs they're liable for,

22   that's not going to be decided in our motion.  That's a

23   separate set of motions after that.

24          And so what discovery is appropriate for our motion?

25   We contend no discovery is needed.  Number one, because there's          10:11:31

1    already been a whole lot of discovery done.  But number two,

2    there's only a few simple things you have to conclude to find

3    that there's liability under CERCLA 107(a).

4         You have to conclude that these defendants own a

5    facility, that there's been a release or a threatened release        10:11:49

6    of contaminants.  We call them VOCs in this case.  That there's

7    a plausible pathway by which those migrated to our site, to the

8    RID wells or to the WVBA area.  And the Court's already found

9    that.

10        And that we have those same PRP -- those same VOCs are        10:12:17

11   the ones that are in -- that have contaminated the WVBA.  Those

12   facts have been determined by the government agencies, and

13   they're really not in dispute.

14        They also want to take -- I've already talked about

15   how -- the fact that they want to take discovery on whether        10:12:38

16   there's NCP compliance and necessity.  Those have been ruled

17   on.

18        The last thing they want to take discovery on, let me

19   spend a minute on, divisibility, because Mr. Thomas spent a

20   minute on that.        10:12:52

21        Divisibility is a defense to joint and several

22   liability.  So you don't need to decide the divisibility issue

23   to grant our motion for summary judgment that simply says

24   you're liable.  They would still have the ability to come back

25   and say, well, wait a minute, we think -- we may be liable, but        10:13:07

1    we think it's divisible.  And at that point they could take

2    discovery on that.

3         But in fact, Your Honor, it's clear under the record

4    we have that they are not going to be able to show

5    divisibility.                                              10:13:26

6         We cited the *Pakootas* case, a very recent

7    Ninth Circuit case.  Let me comment on that for a minute.

8         The *Pakootas* case involved an issue of divisibility.

9    The defendant said they had -- that there were lots of parties

10   that had contributed to the contamination of the waterway.  And   10:13:42

11   that they claimed that they -- they had an expert, in fact,

12   that said, gee, I can parse it all out.  And the Court

13   ultimately said, no, you can't.

14        There's two steps to a divisibility analysis.  The

15   first step is whether it's theoretically possible to apportion   10:14:00

16   the responsibility here.  And that is primarily a matter of

17   law, the *Pakootas* court said.  And if you determine it's

18   theoretically possible, then the second step is to look at a

19   very factual intensive exercise.

20        Here it's not theoretically possible to divide up the   10:14:20

21   responsibility here.  And the reason is, because there are so

22   many potential PRPs.  In the -- two of the defendants, the City

23   of Phoenix and the Prudential Overall Supply, belong to what's

24   called the Phoenix Working Group.  And -- I should say the West

25   Van Buren Working Group.  And they have their own feasibility   10:14:48

```
1   studies that have been approved by the ADEQ, and they've issued
2   their own letters.
3           And so we cited in the brief a letter issued by the
4   West Van Buren Working Group that did a specific study of the
5   PRPs -- or potential PRPs that had contributed to this area.      10:15:07
6   And that study shows that there are -- well, first of all it
7   says, the Working Group did not conduct a comprehensive PRP
8   search.
9           I'm reading from it.  This is Exhibit 5 to our
10  response to their 56(d) motion.                                   10:15:24
11          So they didn't do a complete comprehensive PRP search.
12  But they concluded there were some 3800 different businesses
13  that had contributed to the pool of contaminants that merges
14  into a plume of contaminants that eventually winds up in the
15  WVBA.  3800.                                                      10:15:52
16          Now most of those, of course, no longer exist,
17  Your Honor, you can appreciate that.  But these thousands,
18  there is no way, even on a theoretical basis, that anyone could
19  parse out and say, there's -- all right, here's all these 3800
20  past contributors.  It's just impossible to try and parse that   10:16:12
21  out.  Especially when they all merge, as the studies show, into
22  a combined plume that flows generally from east to west and
23  winds up polluting the West Van Buren Study area.
24          Just as a matter of interest, their own report, the
25  Working Group report, says that there are 545 dry cleaners,      10:16:32
```

1   just dry cleaner establishments, that have contributed to that,

2   or potentially contributed to that.  The study says that

3   they've documented 150 of those, just the dry cleaning

4   establishments, they have documented that used VOCs during that

5   period that would have found their way into that plume.                10:16:58

6           Now, Your Honor, given those facts, there's no way

7   that anybody can come back and say, well, I have a way to

8   divide it all up.

9           *Pakootas* says the first thing you need to do is

10  determine the whole scope of the pie, it calls it, all the             10:17:16

11  contamination that has taken place.  And only when you do that

12  could you attempt to try and say, here's my slice of the pie.

13  You can't just say, I contributed X pounds of contaminant.  You

14  have to first determine the entire amount of contamination.

15  That's impossible to do in this case.                                  10:17:37

16          As their own report points out, the contamination has

17  been going on at least since 1920.  Or at least that's the

18  dates they looked for, between 1920 and going forward.

19          So divisibility, number one, it's only a defense to

20  joint and several liability.  It's not something we have to            10:17:54

21  prove or disprove, it's something they would have to prove.

22  But it's not on this record theoretically possible in any

23  event.

24          So what we're simply asking the Court to do is to find

25  that these PRPs are liable, these three defendants.  And then          10:18:08

1    the issue of what costs they're liable for would have to be

2    assessed and determined.

3          Let me comment briefly on some of Mr. Thomas's

4    statements about the pipeline and water quality.

5          The pipeline that he's talking about, or the future      10:18:27

6    pipeline -- there is no pipeline now.  The future pipeline has

7    nothing to do with the remediation in this case.  That's

8    relevant only to maybe some future attempt to make a profit

9    selling water.  But it has nothing to do with the remediation

10   in this case.                                                  10:18:49

11         ADEQ many years ago -- for many years has investigated

12   this site.  It came up with some specific plans, work plans,

13   feasibility studies, operation and maintenance work plans that

14   RID is to carry out.  And Gallagher & Kennedy has been using

15   what funds that are available to try and do that over the last 10:19:12

16   six years.  If the case is dismissed, that will end, and the

17   cleanup of the pollution will end.

18         We believe we have a viable cause of action under

19   102 -- excuse me, under CERCLA 107.  And that the orderly

20   fashion that these are done is, first you determine liability, 10:19:32

21   you determine what costs are legitimate costs for which we can

22   be compensated.  Other contribution actions are brought.  And

23   that's the course of things.

24         As long as a PRP who is engaged in polluting

25   activities isn't required to respond, they're not going to     10:19:52

—CV-16-4447-PHX-DAE – February 21, 2019—

1    respond.

2           Now Mr. Lutz said, oh, well, we've already settled and

3    we've done the cleanup we need to do.  Well, none of these

4    three plaintiffs has done any -- taken any actions to go into

5    the WVBA and try and clean out those contaminants.  It's only          10:20:12

6    RID that has done that, through the plans that have been

7    approved by ADEQ.

8           ADEQ has, in fact, approved a plan for the Working

9    Group that I mentioned, which includes Phoenix and Prudential.

10   Approved a plan where they could put in two wells into the WVBA       10:20:30

11   area, and they could pump and treat groundwater, just like RID

12   is doing.  And guess what, that approval also requires that it

13   will be done to water quality standards, because that's the

14   remedial objectives here.

15          Have they done that?  No, they haven't done that.           10:20:50

16   It's only RID that has taken action to do it.  But that can't

17   continue unless liability is found for some PRPs.  Because it

18   is a fact that Gallagher & Kennedy is trying to use funds it

19   can collect from PRPs, if it could.  But no PRP is going to

20   step forward if the Court says, oh, the case is dismissed, RID       10:21:15

21   case dismissed, G&K case dismissed.

22          So we would urge you to deny both of these motions,

23   Your Honor, allow our summary judgment motion to proceed.  They

24   can brief it.  And we can go forward with the cleanup.

25          THE COURT:  Okay.  Thank you.                              10:21:33

1        So two points you might want to address.  First, he's

2   basically suggesting that you're just trying to kick the can

3   down the road for no good purpose, essentially.  And then that

4   you, on behalf of your client, are really trying to relitigate

5   the prior case.                                                     10:22:05

6        MR. THOMAS:  Well, let's -- let me take the second

7   issue first.

8        You obviously issued a couple rulings on whether the

9   costs incurred by Roosevelt Irrigation District were consistent

10  with the NCP.  And those are by definition not costs allegedly    10:22:21

11  incurred by G&K.

12       You're obviously the best judge of -- at the time of

13  that ruling, of course, what was before the Court was that

14  subset of costs that RID had paid for out of its own pocket.

15  By definition those costs did not include Gallagher & Kennedy's   10:22:47

16  contingent fees.

17       I think it makes -- probably good to clarify who has

18  done what here.

19       The four wellhead treatment units that are installed

20  were paid for by a company called Spinnaker.  Spinnaker also      10:23:05

21  paid for the sporadic operation of those treatment units.  The

22  environmental consulting firm, Synergy Environmental, like

23  Gallagher & Kennedy, they advanced their professional services

24  on a contingent basis.  Both Spinnaker and Synergy filed their

25  own independent suit to seek recovery of those costs.  That was   10:23:32

——— CV-16-4447-PHX-DAE – February 21, 2019 ———

1    dismissed without prejudice some time ago.

2          So Gallagher & Kennedy is not here seeking recovery of

3    the treatment unit plant costs incurred by Spinnaker or the

4    professional service fees advanced by Synergy Environmental.

5    As Mr. Dangerfield said, Gallagher is here seeking its past     10:23:59

6    costs.  Those past costs, except for the mystery $450,000, are,

7    to the best of my knowledge, all accrual revenue of the

8    Gallagher & Kennedy firm.

9          Some portion of that amount, allegedly 15 to $20

10   million, may or may not be recoverable under *Key Tronic* as     10:24:24

11   private party enforcement costs.  We have a redacted partially

12   complete set of G&K bills.  And that's it for the record on

13   that.

14         I don't think -- you can correct me if I'm wrong, but

15   I don't think that you intended in your ruling, about whether    10:24:46

16   RID's incurred costs were consistent, to opine on whether

17   Gallagher & Kennedy's accrual revenue attorney's fees were

18   consistent.

19         THE COURT:  That wasn't an issue then.

20         MR. THOMAS:  Yes.  That -- at most dicta.              10:25:02

21         So there's obviously some broad language in that

22   ruling, but I don't think that those -- the recoverability

23   of --

24         THE COURT:  And I may agree with them now, I don't

25   know.                                                        10:25:15

1          MR. THOMAS:  Obviously we need to understand exactly

2  how much time was spent doing what in order to determine that.

3          Let me address the issue of kicking the can down the

4  road.

5          The City has again in this case been sued because it's          10:25:29

6  the landlord of Honeywell, part of its facility at the airport.

7  It's a matter of public record that we have a defense and

8  indemnity arrangement with Honeywell.  To the extent the City

9  is liable under CERCLA for cleanup costs arising from

10  Honeywell's alleged releases, we will be made whole.          10:25:50

11          So speaking for the City at least, we're not kicking

12  the can down the road because we're trying to avoid spending

13  money on unnecessary cleanup.  A, we don't think the cleanup is

14  necessary.  And B, it's not going to be our money to pay for it

15  if it is.          10:26:07

16          We're here, as the letter from Mayor Williams to the

17  EPA, that's one of the attachments in our joint concurrence,

18  because notwithstanding the weather outside today, Arizona's

19  been in a drought for 15, 20 years.  Years ago we switched from

20  pumping groundwater to using Colorado River surface water.          10:26:26

21  We're on the verge of an order by the Bureau of Reclamation

22  that will reduce Arizona's entitlement to Colorado River water.

23  If that carries forward, then we will again need, in the City

24  of Phoenix, to supply -- to pump groundwater to meet the demand

25  of our 1.7 million drinking water customers.          10:26:51

1          We, in fact, had some wells impacted that previously

2     were part of our drinking water system that we shut down,

3     figuring that over time nature would reduce the contaminant

4     levels and obviate the need for treatment.  To the extent that

5     Gallagher and RID and Synergy and their investment partners          10:27:14

6     were correct in 2015 or so, that the -- if they could control

7     this supply of water it could be sold as a drinking water

8     supply for $1.9 billion over three years.  I don't know if

9     that number is right or not.  But if it is, that's $1.9 billion

10    that the City of Phoenix would have to come up with to replace      10:27:39

11    the supply that they've exported out of our service area.

12          That's why we're alarmed.  That's why we're, quote,

13    kicking the can down the road.

14          With respect to your prior ruling, the -- you were

15    quite clear in your series of rulings that you had not            10:27:58

16    addressed the necessity of even the costs incurred by RID.  You

17    were quite clear that you had not decided whether any

18    individual party was liable because of the causation issue.

19    And you properly noted that we'll need some expert hydrogeology

20    testimony to figure out whether alleged releases from point A     10:28:24

21    got to any particular point downstream.

22          In the case of Phoenix, the Honeywell facility is

23    upgradient of well 114.  What's between well 114 and the

24    Honeywell facility is a groundwater containment and treatment

25    system that's been operating for close to 20 years now, which     10:28:48

1    the City of Phoenix helped pay for.  So it's –– and Honeywell

2    and Motorola have also funded that.

3            So it's not accurate to say nobody is doing anything

4    about the groundwater cleanup besides RID and G&K.

5            I'm happy to entertain any questions you have.  If                    10:29:09

6    not, we'll rest on the pleadings.

7            Thank you.

8            THE COURT:  No, because I've got the papers.  I

9    understand what your argument is.

10           MS. UGLIETTA:  Your Honor, may I have just a couple of                10:29:18

11   minutes for the County?

12           THE COURT:  Sure.

13           MS. UGLIETTA:  Thank you.

14           Good morning, Your Honor.

15           THE COURT:  Good morning.                                             10:29:37

16           MS. UGLIETTA:  I'd just like to address a few of the

17   statements that were made earlier.

18           First of all, the County has been brought into this

19   lawsuit as one of the three targeted.  Gallagher & Kennedy

20   failed to sue its former clients in this case, and it dismissed          10:29:51

21   a number of other defendants that it previously had sued for no

22   apparent reason.

23           The County, as I indicated in my declaration, which I

24   submitted to you with the Rule 56(d) application, the County

25   settled with ADEQ in connection with its site in this case.  It         10:30:10

1    settled in 2001 after cleaning up its site.  The County is an

2    innocent landowner in this case.  It is only in this case

3    because of a targeting by Gallagher & Kennedy, not because the

4    County, in fact, has been proven to have contributed to any

5    contamination of RID's well sites that are at issue.                    10:30:34

6            I wanted to point out that the County is not even part

7    of the ADEQ WQARF West Van Buren site plan.  We're located

8    outside that site plan.  Even Exhibit 17 to Gallagher &

9    Kennedy's current motion for summary judgment shows that the

10   County is outside ADEQ's proposed expansion of the OU-3 site.          10:30:58

11           The County also has contribution protection that ADEQ

12   has provided to the County as part of the consent decree that

13   was entered by Judge Silver in this case.

14           The County, if it were to be required to move forward

15   in this case, has the right and is considering bringing               10:31:24

16   third-party claims in this case.  The County has yet to answer

17   in this case.  The County has yet to make a determination

18   whether to file third-party claims.  And if it does, those

19   third-party defendants would have the right to appear before

20   this Court and protect their interests.  None of them today are       10:31:40

21   here.

22           And because of the way that Gallagher & Kennedy have

23   pled this case and then dismissed other defendants, those

24   particular entities at this point are excluded, and it would be

25   unfair to them and to the County for any substantive decisions        10:31:56

1    to be made on ruling on summary judgment without them first

2    having the opportunity to be here and the County have the

3    opportunity to bringing them in.

4          Secondly, I want to point out that despite Gallagher &

5    Kennedy's assertation that there are only simple things for          10:32:13

6    this Court to decide, it may superficially appear to be simple,

7    but if you look at the summary judgment motion that they have

8    provided to you, the statement of facts is founded only upon

9    hearsay documents that are from historic ADEQ and other

10   parties' reporting that was done in connection with their          10:32:31

11   sites.

12         But those hearsay documents are not supported by any

13   expert evidence, they're not supported by any foundational

14   evidence before this Court, they're not sworn.  So they cannot

15   be, you know, decided -- the issue of liability could not be          10:32:49

16   decided upon those documents in any event.

17         Secondly, we have to remember that at the time that

18   the County and the other defendants settled the RID case, we

19   were not yet done with that discovery.  And so the simple

20   issues that Gallagher & Kennedy purports to be before the          10:33:07

21   Court, they have not even been litigated in the first case, let

22   alone this case.  And there are a number of fact issues that we

23   still need to cover.

24         They also submitted to the Court with the summary

25   judgment motion declarations from two individuals.  One of the          10:33:22

1    individuals was an individual who was to be deposed in the RID

2    case.  That deposition did not go forward.  Why?  Because we

3    settled the case.  That was Mr. Kimball.

4         There were also depositions that were noticed of G&K

5    and RID.  Those depositions also did not go forward because we      10:33:41

6    were not yet -- they had not yet been done.

7         THE COURT:  So you want a continuance so you can take

8    care of this discovery?

9         MS. UGLIETTA:  I'm sorry?

10        THE COURT:  You want the continuance so you can take      10:33:51

11   care of this discovery.

12        MS. UGLIETTA:  Yes.  We'd like to take care of the

13   fact discovery, the discovery that we were unable to complete

14   in the first case and is necessary in this case.

15        And secondly, and importantly, in connection with this      10:34:02

16   plausible migration theory that we've been hearing about today,

17   and that we've heard about before, that cannot be decided by

18   this Court without expert opinion before you.  They have not

19   submitted any.  And the County has the right to submit expert

20   opinions to you on that issue.      10:34:20

21        And we would respectfully request that we be

22   permitted to complete our fact discovery, have the opportunity

23   to develop expert discovery, take depositions of their experts,

24   if they, in fact, bring forward any experts.  And that we have

25   the opportunity to bring forward to you our experts on that      10:34:35

—— CV-16-4447-PHX-DAE – February 21, 2019 ——

1    issue.

2          So I would request that the Court grant our motion for

3    56(d) relief, and that we proceed forward for a case management

4    schedule that would allow all of these things to happen in the

5    appropriate procedural sequence.                               10:34:51

6          THE COURT:  All right.  Well, thank you all very much.

7    As I said, we have the briefing.

8          It will take me a little while, not -- hopefully not

9    too long.  I was in much better shape when I was still a Hawaii

10   District Judge than I am as a senior judge.  And that's        10:35:12

11   laughable in the district -- Western District of Texas.  I have

12   the heaviest case load there, and it's the second busiest

13   district in the United States.  I did 12 trials last year.  And

14   which, in the day of the dying federal trial, is an amazing

15   number.  And I had -- what did I have, how many hours on the    10:35:36

16   bench last year?  700, something like that?  Just astronomical

17   numbers for a federal judge.  So I've got a lot, a lot of

18   cases.

19          But this is a priority for me, obviously.  I've been

20   invested in it, as you have, for a very long time.  And, of     10:35:53

21   course its -- I shouldn't say predecessor, because Pinal Creek

22   had nothing to do with this, except that we had many of the

23   same excellent counsel in both cases.

24          But I do want to get to it.  And I do want to provide

25   you with a reasoned readable order.  No judge -- I would hope   10:36:13

UNITED STATES DISTRICT COURT

1   no judge thinks their orders are, you know, pulp fiction.  But

2   nonetheless, I think we should put something out that makes

3   sense and is readable.  And not just for your benefit, of

4   course, but also in the event of an appeal somewhere down the

5   road for the Court of Appeals.                              10:36:39

6        And you all know I sit on the Court of Appeals for the

7   Ninth Circuit regularly.  In fact, I hold the record for the

8   most number of sittings by a designated judge in the history of

9   the Ninth Circuit.  I was just told that the other day.  I

10  didn't know that.  I don't know that that's something to be    10:36:53

11  proud of.

12       So I'm going to try to make a -- you know, put out a

13  reasoned order.

14       When I first started here in Arizona many, many

15  decades ago, when I was what we call in the federal judiciary a  10:37:09

16  baby judge, Judge Dick Chambers -- and many of the younger

17  lawyers here won't know who he is, but the older ones certainly

18  will -- took me under his wing.  And I remember I used to go to

19  lunch with Dick regularly, and he -- we were in -- at lunch one

20  day, and I had had a particularly bad night's sleep the night   10:37:33

21  before for some reason, and I said, what do you do, you do all

22  this traveling, to fall asleep, how do you keep yourself from

23  being exhausted the next day?

24       And he said, David, here's the surefire cure for that.

25  And he said, I just bring one of my old orders with me and I    10:37:52

64

1    start to read it at night and I fall right back to sleep.

2              I haven't tried that yet, but maybe I should.

3              I'll try to get this out within the next few weeks, if

4    I can.  I'm not one of these judges that takes stuff under

5    advisement and you have to call after four months and try to          10:38:12

6    figure out if the judge is still breathing.  I'll try to get it

7    out within the next two to three weeks.

8              I do want to look again at some of the things that

9    were brought to my attention specifically today that -- some of

10   it was in the briefing but wasn't emphasized.                          10:38:29

11             And that's why I have oral argument on these things.

12   I could decide these things on the papers, but I think that's a

13   disservice to the parties.

14             And this is no vacation, I can assure you.  I'm on a

15   plane -- this one is on a plane tonight, and I'm on a plane            10:38:43

16   first thing tomorrow morning.  So this is no vacation.

17             So I will do that.

18             We can go off the record for a minute.

19        (Discussion held off the record.)

20        THE COURT:  All right.  So I will get this out as                 10:41:53

21   quickly as I can.  I do thank you so very much for your

22   arguments, for your briefing, and for making yourselves

23   available today on what is less than a lovely Phoenix day.  I

24   understand I missed the good weather by one day.

25             And we will -- I'm sure we'll see each other again at        10:42:12

1    some point.  This isn't going to be the close of business in

2    this case, I don't think.

3             Thank you.

4        (Proceedings concluded at 10:42 a.m.)

5

6                           -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, CANDY L. POTTER, do hereby certify that I am duly
appointed and qualified to act as Official Court Reporter for
the United States District Court for the District of Arizona.

        I FURTHER CERTIFY that the foregoing pages constitute
a full, true, and accurate transcript of all of that portion of
the proceedings contained herein, had in the above-entitled
cause on the date specified therein, and that said transcript
was prepared under my direction and control.

        DATED at Phoenix, Arizona, this 12th day of March,
2019.




                        s/Candy L. Potter_____
                        Candy L. Potter, RMR, CRR